Corinne EVANS, By and Through her guardians ad litem J. Blake EVANS and Donalee J. Evans, Plaintiffs and Appellants,

v.

Donald B. DOTY, Defendant and Appellee.

No. 900132–CA.

Court of Appeals of Utah.

Dec. 12, 1991.

Jackson Howard, Kevin J. Sutterfield, and Leslie W. Slaugh, Provo, for plaintiffs and appellants.

David H. Epperson and Jaryl L. Rencher, Salt Lake City, for defendant and appellee.

Before BILLINGS, GREENWOOD and JACKSON, JJ.

1. This amended opinion replaces the opinion in

## AMENDED OPINION [1]

BILLINGS, Associate Presiding Judge:

This is an appeal in a medical malpractice action following a jury verdict in favor of the defendant doctor. On appeal, plaintiff asserts that: (1) during voir dire, the trial judge refused to ask prospective jurors questions sufficient to allow the plaintiff to exercise her peremptory challenges; and (2) there is insufficient evidence to support the jury verdict and, therefore, plaintiff is entitled to a new trial. We affirm.

## FACTS

Plaintiff, Corinne Evans, was born in January 1982, six weeks premature and suffering from Downs Syndrome. In October 1983, Corinne was hospitalized for severe pneumonia. During her hospital stay, doctors discovered Corinne also suffered from extreme pulmonary hypertension. Tests revealed the hypertension was caused by a patent ductus arteriosus. The ductus arteriosus is a blood vessel which bypasses the non-functioning lungs of an infant prior to birth. At birth, the ductus normally closes spontaneously. In Corinne's case, however, the ductus failed to completely close, resulting in the defect.

Corinne's parents selected the defendant, Doctor Donald J. Doty, to operate on Corinne to correct the condition. Dr. Doty is a certified cardio-thoracic surgeon. Dr. Doty had performed more than one hundred patent ductus repairs, and has written extensively about the procedure.

Dr. Doty successfully repaired the ductus. However, during surgery, Corinne's recurrent laryngeal nerve, which runs near the ductus, was permanently damaged. As a result, Corinne's left vocal cord was paralyzed. Following surgery, Corinne, through her parents, commenced this law suit, claiming Dr. Doty negligently injured the nerve during surgery.

During voir dire Corinne's attorney submitted many questions; in fact, the voir dire lasted two hours. However, over Corinne's attorney's objections, the trial judge refused to ask several questions designed

Case No. 900132–CA issued on October 16, 1991.

to probe the jurors' exposure to tort reform propaganda. After a four-day trial the jury returned a verdict finding Dr. Doty was not negligent.

## VOIR DIRE

■ First, Corinne claims the trial judge improperly refused to ask potential jurors certain questions during voir dire and, as a result, the voir dire was insufficient to allow her counsel to intelligently exercise her peremptory challenges. Corinne does not claim the trial judge failed to remove certain jurors for cause.[2]

■ This court reviews challenges to a trial judge's voir dire under an "abuse of discretion" standard. *Doe v. Hafen*, 772 P.2d 456, 457–58 (Utah App.1989), *cert. denied*, 800 P.2d 1105 (Utah 1990). A trial court abuses its discretion and thus commits reversible error when, "considering the totality of the questioning, counsel [is not] afforded an adequate opportunity to gain the information necessary to evaluate jurors." *State v. Bishop*, 753 P.2d 439, 448 (Utah 1988).

Voir dire has two distinct and equally important purposes: the first is to detect actual juror bias—the basis of a "for-cause" challenge; and the second is to allow parties to collect sufficient information to intelligently exercise peremptory challenges. *See Ostler v. Albina Transfer Co., Inc.*, 781 P.2d 445, 447 (Utah App. 1989), *cert. denied*, 795 P.2d 1138 (Utah 1990); *Hafen*, 772 P.2d at 457. In this case we are concerned with the second category. As we recently stated, a "trial judge should liberally allow questions 'designed to discover attitudes and biases, both conscious and subconscious,' even though such questions go beyond that needed for challenges for cause." *Hafen*, 772 P.2d at 457 (quoting *State v. Worthen*, 765 P.2d 839, 845 (Utah 1988)). The Utah Supreme Court has elaborated on the purpose of peremptory challenges:

> Although a trial judge has some discretion in limiting voir dire examinations, ... that discretion should be liberally exercised in favor of allowing counsel to elicit information from prospective jurors.... Indeed, the fairness of a trial may depend on the right of counsel to ask voir dire questions designed to discover attitudes and biases, *both conscious and subconscious, even though they would not have supported a challenge for cause....* Juror attitudes revealed during voir dire may indicate dimly perceived, yet deeply rooted, psychological biases or prejudices that may not rise to the level of a for-cause challenge but nevertheless support a peremptory challenge.

*State v. Worthen*, 765 P.2d 839, 845 (Utah 1988) (emphasis added).

■ Accordingly, it is not enough for a trial judge to ask questions merely to discover a potential juror's overt biases. The judge must also allow counsel the opportunity to hear responses to questions that may indicate hidden or subconscious attitudes. Without such an opportunity, the prospect of impaneling a fair and impartial jury is diminished.

At trial, Corinne's counsel submitted a list of proposed voir dire questions including several general questions probing the prospective jurors' exposure to tort reform information. Additionally, Corinne's counsel identified and offered a specific example of such propaganda, a cover article in the March 24, 1986 issue of *Time* magazine entitled "Sorry, Your Policy Is Cancelled." Corinne asked the court to question the potential jurors about any exposure to this magazine article. Some of the specific questions Corinne proposed included:

2. At trial, Corinne's attorney apparently objected to the impaneling of one juror on the grounds that the juror's spouse was employed by an insurance company, and also that counsel had not been allowed to question the juror concerning this employment. The only mention of this issue on appeal is in a short statement in the "issues" portion of Corinne's brief. Because Corinne has not sufficiently briefed or argued this issue on appeal, we decline to address its merits. Generally, this court will not manufacture a legal argument for an appellant who fails to brief or argue an issue. *See English v. Standard Optical Co.*, 814 P.2d 613, 618–19 (1991); *Cardin v. Morrison–Knudsen*, 603 P.2d 862, 865 (Wyo.1979).

Have you read magazine or newspaper articles or other literature about medical negligence?

Did any of you read *Time* magazine in March, 1986?

Have you ever signed any petition on the issue of negligence?

Have you seen anything in your doctor's office about negligence?

Have you discussed [medical negligence] with your family doctor or friends?

Rather than asking the prospective jurors Corinne's requested questions in the area of exposure to "tort reform" material, the trial judge asked:

Now, many of you have heard and read articles, and there have been television programs, with regard to negligence on the part of doctors. Do any of you have any strong feelings as a result of seeing or reading anything about medical negligence that would make it so that you couldn't be fair and impartial here today?

Now, do any of you have any strong feelings about anyone bringing a lawsuit against a doctor?

Following the first question, two jurors indicated their inability to be fair and impartial, and the trial judge dismissed them for cause. There was no response to the other question. At the conclusion of the two-hour voir dire, the judge impaneled the jury over plaintiff's objections.

Dr. Doty claims the trial judge properly refused to ask the questions posed by Corinne's attorney as these questions would have improperly introduced the issue of insurance. Though Corinne's requested questions did not directly refer to insurance, Dr. Doty claims that because they focused on potential "tort-reform" bias, the questions indirectly suggested that Dr. Doty carried liability insurance and thus were properly excluded on that basis.

Recently, many jurisdictions have been faced with the issue of when a plaintiff may infuse insurance into voir dire questioning. The issue of insurance-related voir dire questioning has arisen in three distinct situations. First, plaintiffs have sought to inquire into prospective jurors' relationships with insurance companies. *See, e.g., Broberg v. Hess*, 782 P.2d 198, 200 (Utah App.1989); *Hafen*, 772 P.2d at 458; *Saltas v. Affleck*, 99 Utah 381, 105 P.2d 176, 179 (1940); *Balle v. Smith*, 81 Utah 179, 17 P.2d 224, 227–32 (1932). Second, plaintiffs have requested permission to determine whether jurors have been exposed to a specific, identifiable media report or advertising campaign; often where insurance companies have funded such a campaign to convince the public of the "evils" of modern tort law and the impact of large jury awards on insurance premiums. *See, e.g., Ostler*, 781 P.2d at 447; *Borkoski v. Yost*, 182 Mont. 28, 594 P.2d 688, 689–90 (1979). Finally, plaintiffs have sought to inquire of jurors as to their general knowledge about and attitudes toward medical negligence and tort reform without regard to a specific advertising campaign or news media report. *See, e.g., Hafen*, 772 P.2d at 458–59; *Barton v. Owen*, 71 Cal.App.3d 484, 139 Cal.Rptr. 494, 508–09 (1977). In this case, both the second and third categories described above are at issue.

The underlying concern in each of these situations is whether discussing insurance in front of jurors may lead the jurors to infer that the defendant carries liability insurance.[3] Utah courts have never

---

**3.** The traditional logic is that a jury may be more likely to find for the plaintiff or increase a plaintiff's damage award if the jury knows the defendant has insurance. *Balle*, 17 P.2d at 229. This per se "insurance" rule developed during a time when liability insurance was uncommon. "When the rule against disclosure of insurance originated doubtless the existence of such protection for defendants was exceptional and a 'hush, hush' policy could be effective." McCormick, *Evidence* § 201 at 481 (2d ed. 1972).

More recently, however, courts have begun to question this traditional "insurance" rule. *Cau-*

*sey v. Cornelius*, 164 Cal.App.2d 269, 330 P.2d 468, 472 (1958). The Third Circuit Court of Appeals has noted:

The word "insurance" is not outlawed from the courtroom as a word of magical evil. Jurors are not unaware that insurance is at large in the world and its mention will not open to them a previously unknown realm. It is in fact more realistic for the judge to dissolve the phantom by open talk in the courtroom than to have it run loose in the

adopted a rule that discussion of insurance is per se improper, but instead have recognized that whether a plaintiff may discuss insurance with the jury must be evaluated from the particular facts of the individual case.

> [P]laintiff in a personal injury or death case, if acting in good faith for the purpose of ascertaining the qualifications of jurors, and not merely for the purpose of informing them that defendant is insured, may in one form or another inquire of prospective jurors on voir dire examination with reference to their interest in or connection with insurance companies.

*Balle,* 17 P.2d at 229. More recently, this court has recognized that the issue of insurance voir dire questioning involves a delicate balancing of the respective interests of the parties, and that plaintiffs must conduct any insurance-related inquiry in good faith. *Broberg,* 782 P.2d at 200-01.

Both Corinne and Dr. Doty principally rely on the reasoning in the 1979 Montana Supreme Court case of *Borkoski v. Yost,* 182 Mont. 28, 594 P.2d 688 (1979), as determinative of whether tort-reform inquiry should be allowed during voir dire.[4] In *Yost,* a medical-malpractice action, the plaintiff sought to pursue a line of inquiry during voir dire to determine the existence of juror bias as a result of a specific national advertising campaign by insurance companies. The advertising campaign had run in several national magazines during the time when the jury was impaneled. Plaintiff's counsel requested

> permission to examine prospective jurors with a line of inquiry to determine whether any prospective jurors have

been exposed to, have observed, or are aware of *the national campaign* by leading insurance companies, directed particularly at prospective jurors, to the effect that large jury verdicts are in fact paid by the general public at large and constituted "windfalls" to the recipients.

*Id.* 594 P.2d at 690 (emphasis added). The trial court denied plaintiff's motion, but did allow plaintiff's counsel to "inquire as to each juror whether or not they feel that doctors are unnecessarily or professional people are unnecessarily oppressed by suits or large verdicts." *Id.* The jury returned a verdict in favor of the defendants.

On appeal, the Montana Supreme Court held that the trial court should have allowed the line of questioning as to the insurance companies' advertising campaign. The court held that:

> [I]n appropriate cases, an attorney upon voir dire may inquire of prospective jurors whether they have any business relationship with insurance companies and whether they are policyholders of an insurance company named as a defendant or of a mutual insurance company involved in the case. [Further], upon a proper showing of possible prejudice, an attorney may inquire whether a prospective juror has heard or read anything to indicate that jury verdicts for plaintiffs in personal injury cases result in higher insurance premiums for everyone; if so, whether the prospective juror believes such materials; and if so, whether that belief will interfere with the juror's ability to render a fair and impartial verdict. Depending on the responses received to these inquiries and subject to the discre-

---

unconfined speculations of the jury room. The court has wide control over the *voir dire* and can adequately safeguard the inquiry by explaining to the jurors the limited scope and purpose of the examination and thus eliminate any implication of the existence or relevance of insurance in the case before it. *Kiernan v. Van Schaik,* 347 F.2d 775, 782 (3d Cir.1965).

There can be little question that even unsophisticated jurors will suspect the existence of insurance. "[T]he general prevalence of liability insurance for automobile injuries is known to the jurors; hence, for the law to forbid any

disclosure of it in the course of the trial seems to be merely a piece of hypocritical futility." 2 J. Wigmore, *Evidence* § 282a at 169 (Chadbourn rev.1979); *see also Silver State Disposal Co. v. Shelley,* 105 Nev. 309, 774 P.2d 1044, 1047 (1989) (jurors are likely aware of insurance coverage). Accordingly, the underlying rationale for the insurance rule has been greatly eroded as, today, corporations and individuals almost universally purchase insurance.

**4.** This court has previously considered *Yost* persuasive. *See Hafen,* 772 P.2d at 459.

tion of the trial court, limited follow-up inquiries may be made.

*Id.* at 694. The court adopted this rule because

> [w]hen insurance companies inject the issue of insurance into the consciousness of every potential juror through a high priced advertising campaign, ... they threaten every plaintiff's right to an impartial jury. ... In such cases, it is only fair that attorneys have some means to secure this right for their clients. Liberal voir dire is the best means to this end.

*Id.* (citations omitted). The *Yost* court was dealing with a particular advertising campaign. In this context the court explained that when, during voir dire, a party inquires about particular advertisements and specifically interjects the issue of high insurance premiums, the questions are proper only where counsel first asks certain general introductory questions. Counsel must first ask questions to determine if the prospective juror has read anything that might affect the juror's impartiality, or whether the juror regularly reads any of the magazines or publications that have printed the prejudicial material. If "no positive responses are received to these introductory inquiries, there is no reason to pursue further the line of inquiry we have approved above." *Id.* at 695. Finally, the *Yost* Court imposed a "good faith" requirement on plaintiff's counsel: counsel cannot merely be attempting to suggest to jurors that the defendant carries liability insurance. *Id.*

The *Yost* court, however, found the trial court's refusal to allow the inquiry on voir dire was harmless error. The court pointed out that the ad campaign complained about by the plaintiff focused on the size of the jury award, and at no point suggested "that juries should not find a party negligent in the first place." *Id.* Thus, the *Yost* court apparently believed that any bias created by the ad campaign would only manifest itself when the jury considered the amount of damages. Because the *Yost* jury found no liability, the court found the error harmless.

The *Yost* court was not faced specifically with the issue of what questions about general tort reform are permissible when the plaintiff cannot show the existence of a specific tort-crisis advertising campaign or article, but instead wants to uncover information about the potential juror's exposure to general information on medical negligence and tort reform for the purpose of exercising peremptory challenges. Despite the *Yost* court's failure to address this issue, however, its approach suggests that general inquiry about tort reform and its effect on juror impartiality—that does not mention or discuss insurance unnecessarily—would be appropriate. *Id.* at 695.

Dr. Doty claims that the trial judge did not err in voir dire because the judge asked appropriate introductory questions as instructed by *Yost* and as adopted in *Hafen.* In *Hafen*, a motorcycle-automobile collision injury action, the trial court asked the jury "whether anyone had read or experienced anything that would affect the amount of compensation they would be willing to award in a verdict." *Id.* at 458. The plaintiff objected to this "generalized" voir dire question, arguing that the question was insufficient "to reach any deep-rooted bias caused by 'tort reform propaganda.' " [5] *Id.* Rather, plaintiff wanted the judge to ask "specifically whether the prospective jurors had read any such 'tort reform propaganda.' " *Id.*

The *Hafen* court upheld the trial court's refusal to ask the proposed "tort reform" questions under an abuse of discretion standard. The court ruled that the question the trial court asked was sufficient. *Id.* at 459. We do not disagree with the holding of *Hafen*. However, in reaching its conclusion, the *Hafen* court relied upon *Yost*'s treatment of questions concerning specific media accounts (i.e. the second cat-

---

**5.** In *Hafen*, the plaintiff also objected to the trial court's refusal to ask the jurors (1) certain general background questions such as their level of education and the types of magazines they read, and (2) whether any jurors had an employment or financial relationship with an insurance company. These questions, however, raise different concerns and issues than those presented by the instant case.

egory of insurance questions) as supporting its decision that the plaintiff must ask one of two alternative general questions, to determine potential juror bias, before proceeding with more specific "tort-reform bias" questions about specific articles:

> [*Yost*] held that before any specific questioning about the articles would be allowed, either of two alternative types of preliminary questions must be asked: "[W]hether the prospective juror has heard of or read anything ... which might affect his ability to sit as an impartial juror ... or ... whether the prospective juror reads any of the magazines or newspapers in which it has been demonstrated that the ... articles had appeared."
>
> We adopt the analysis in [*Yost*] and apply it to the instant case.

*Id.* at 458–59 (quoting *Yost*, 594 P.2d at 695) (citations omitted).

We find the *Hafen* panel's reliance on the *Yost* analysis somewhat confusing. Unlike *Hafen*, which dealt with the third category on insurance questions, *Yost* dealt with the second voir dire "insurance" category where the plaintiff clearly established that the defendant's insurance company had launched a specific, contemporaneous tort-reform advertising campaign.

In *Hafen*, the plaintiff was merely attempting to discover, by a generalized tort-reform question *not* tied to insurance premiums, whether potential jurors had been exposed to tort-reform information in general. This was precisely the type of preliminary question approved in *Yost*. *See* 594 P.2d at 695. In short, *Hafen*'s reading of *Yost* failed to distinguish between the second and third category of voir dire insurance-tort reform questions, and oversimplified the analysis of insurance-tort reform voir dire questions by grouping these two categories together. Thus, to the extent the *Hafen* opinion can be read as per se *not* allowing general questions as to whether jurors have read or seen media reports concerning medical negligence or tort reform where insurance is not specifically interjected, we reject it.

■ In view of this analytical framework, we now turn to the case before us. Corinne's objections to the court's voir dire were two-fold. First, Corinne objected to the trial court's failure to inquire as to the juror's knowledge of a specific *Time* magazine article on tort reform and insurance premiums. Second, Corinne's counsel objected to the trial court's failure to ask general questions designed to discover if any potential juror had been exposed to medical negligence or tort-reform information in general. In this case, both of these objections go to the issue of Corinne's ability to intelligently exercise peremptory challenges.

■ Under the first issue—whether the trial court should have questioned jurors concerning the *Time* magazine article—the *Yost* analysis is instructive because, like *Yost*, this issue fits into the second "insurance" voir dire category outlined above. In *Yost*, plaintiff's counsel demonstrated that defendant's insurance company, the real party in interest, had participated in a contemporaneous, nation-wide advertising campaign designed to influence the public concerning the "evils" of large jury awards. *Yost*, 594 P.2d at 694. Because the advertising raising was ongoing at the time the jury was impaneled, the *Yost* court held that plaintiff's counsel had established sufficient foundation that counsel should have been allowed to question jurors as to their exposure to the campaign. The *Yost* court held that in such circumstances, before an attorney may question jurors as to their exposure to advertisements and media reports, the plaintiff must demonstrate that the jurors are likely to have been recently exposed to such propaganda. *Id.* We adopt *Yost*'s reasoning, and thus hold that before a plaintiff may inquire as to a juror's exposure to a specific article or advertisement raising specifically the issue of the need for tort-reform and its relationship to high insurance premiums, the plaintiff must lay a foundation showing that the juror is likely to have been exposed to the material, and further that the material was published recently enough so that the juror will likely remember reading it.

In this case, the *Time* article was three years old when the jury was impaneled. Thus, jurors were not likely to remember having read the article. Corinne's proposed question asked jurors whether they had "read *Time* magazine in March, 1986." We find it unlikely that, in 1989, any jurors would be able to accurately respond to such a question. Accordingly, because jurors were unlikely to have recently read the *Time* article or to remember having read it, we do not find the trial court abused its discretion in failing to inquire about the specific article.

 Corinne's second objection, however, is more problematic. Corinne's counsel presented several general questions inquiring as to jurors' exposure to information on tort reform and lawsuits against doctors. The questions fit the third "insurance" voir dire category described above. As explained, determining whether an insurance voir dire question such as this should be asked requires a balancing of the relative interests of the parties in light of the facts and circumstances of the particular case. In tort cases, and more particularly in medical malpractice cases, we cannot ignore the reality that potential jurors may have developed tort-reform biases as a result of an overall exposure to such propaganda. *See Yost*, 594 P.2d at 694. Accordingly, in cases such as this one, the plaintiff has a legitimate interest in discovering which jurors may have read or heard information generally on medical negligence or tort reform.

Here, the trial judge did ask questions sufficient to ferret out actual tort-reform biases. However, Corinne claims that the court's questions did not allow her sufficient information to exercise her peremptory challenges. Specifically, Corinne wanted to know which of the potential jurors had been exposed to tort-reform propaganda—even if the potential jurors believed that such exposure had not changed their attitudes or biased them. We conclude she should have been allowed such an opportu-

nity. The judge stated: "[m]any of you have heard and read articles, and there have been television programs, with regard to negligence on the part of doctors. Do any of you have any strong feelings as a result of seeing or reading anything about medical negligence that would make it so that you couldn't be fair and impartial here today?" Had the trial judge first asked jurors which of them could recall exposure to such articles and programs, Corinne would have had an opportunity to identify jurors who had been exposed to such information. Further, this is the type of general preliminary question approved in *Yost*. *See id.* at 695. However, rather than seek responses to such a question, the trial judge instead focused on the issue of for-cause type bias by asking whether jurors felt they could be impartial and fair. The trial judge's line of questions ignored Corinne's need to gather information to assist in exercising her peremptory challenges.

Reason suggests that exposure to tort-reform propaganda may foster a subconscious bias within certain prospective jurors, and, had Corinne been able to identify those jurors exposed to such propaganda, she could have more intelligently exercised her peremptory challenges. Furthermore, we note that Corinne's requested questions made *no* mention of insurance premiums and thus, the risk of prejudicing Dr. Doty's interests under this proposed inquiry was much less than in *Yost*. In sum, we believe the trial court should have asked the potential jurors some of the questions proposed by Corinne about their exposure to tort-reform and medical negligence propaganda—not just if they had been biased by the exposure.

 Our conclusion that the trial judge should have allowed additional questions during voir dire does not end our inquiry. The failure to ask an appropriate question on voir dire does not always constitute an abuse of discretion requiring reversal.[6] We only reverse if "considering

6. A new trial is not always necessary simply because the trial court refuses to ask jurors an appropriate question submitted by one of the parties to the litigation. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984) ("[I]t ill

the totality of the questioning, counsel [is not] afforded an adequate opportunity to gain the information necessary to evaluate jurors." *State v. Bishop*, 753 P.2d 439, 448 (Utah 1988).

Initially, Dr. Doty contends that because the jury found no cause of action for negligence, any voir dire error must be considered harmless. Dr. Doty relies on *Yost*, which held that because the jury found for the defendant on the issue of liability, any failure of the judge to question the jurors regarding tort-reform propaganda was harmless. *Yost*, 594 P.2d at 695. Dr. Doty, however, fails to recognize an important distinguishing factor between *Yost* and this case. As explained above, *Yost* dealt with a very specific and unique situation—the direct impact of an identifiable and contemporaneous nation-wide advertising campaign on potential jurors. Because the advertising campaign in *Yost* advocated lowering jury awards, and did not focus on liability, the *Yost* court believed that a biased jury would manifest their bias by first finding liability and then improperly limiting the damage award. Accordingly, the *Yost* court held that when the jury found for the defendant, such finding was not a result of bias created by the advertising campaign.

In this case, any jury tort-reform bias cannot be traced directly to a single, recent advertising campaign, but may have arisen from an overall exposure to media reports and insurance advertisements. To adopt the *Yost* conclusion, as advocated by Dr. Doty, would be an over-simplification of the harmless-error rule. We cannot assume that a jury would manifest its bias by only reducing damages. It is equally likely that a biased jury might act on its bias by finding the defendant not negligent.

Notwithstanding Dr. Doty's misreading of *Yost*, we believe the trial court's error in denying Corinne's general tort-reform medical negligence question did not rise to the level of an abuse of discretion. Given the totality of the questioning allowed and in light of the extensive, two-hour voir dire, we cannot say the trial court abused its discretion such that we must reverse. The trial court asked many questions that would allow Corinne to intelligently exercise her peremptory challenges, including an inquiry into the jurors' occupations, background, and feelings about medical malpractice law in general. Further, when the trial court asked potential jurors if they could not be impartial because of an exposure to tort-reform information, two indicated they could not be impartial and the trial court excused them. Accordingly, an examination of the totality of questioning leads us to conclude the trial court did not abuse its discretion in conducting voir dire.

## SUFFICIENCY OF THE EVIDENCE

■ Finally, Corinne contends the trial court should have granted her motion for a new trial as there was insufficient evidence to support the jury's verdict. "To successfully attack the verdict, an appellant must marshall all the evidence supporting the verdict and then demonstrate that, even viewing the evidence in the light most favorable to that verdict, the evidence is insufficient to support it." *Von Hake v. Thomas*, 705 P.2d 766, 769 (Utah 1985). "We accord due deference to the jury as the fact finder and do not substitute our-

---

serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information...."); *United States v. Gelb*, 881 F.2d 1155, 1164 (2d Cir.1989) (All circuits agree that whether refusal to ask potential jurors questions "does not always constitute reversible error; that question hinges upon" a number of factors including "the extent to which the [topic] is covered in other questions on voir dire and on the charge to the jury...."); *State v. Malmrose*, 649 P.2d 56, 60 (Utah 1982) ("Traditionally, the trial court is given considerable latitude as to the manner and form of conducting the voir dire examination and is only restricted in that discretion from committing prejudicial error."); *State v. Hall*, 797 P.2d 470 (Utah App.1990) ("For a court's exercise of discretion in disallowing voir dire questions to be overturned, appellant must show that the abuse of discretion rose to the level of reversible error."); *Hornsby v. Corporation of the Presiding Bishop*, 758 P.2d 929, 933 (Utah App.1988) (Only "[s]ubstantial impairment of the right to informed exercise of peremptory challenges" constitutes an abuse of discretion mandating reversal.).

**469**

selves in this role." *Israel Pagan Estate v. Cannon,* 746 P.2d 785, 793 (Utah App. 1987), *cert. dismissed sub nom., Israel Pagan Estate v. Capital Thrift & Loan,* 771 P.2d 1032 (Utah 1989). Corinne has not met her burden of marshalling the evidence, and therefore we affirm the jury verdict finding Dr. Doty was not negligent.[7]

GREENWOOD and JACKSON, JJ., concur.

---

**7.** Although Corinne has failed to marshall the evidence in support of her sufficiency of the evidence claim, review of the trial record shows that, even had Corinne properly marshalled the evidence, there nevertheless is ample evidence to support the jury's verdict in favor of Dr. Doty. At trial, Dr. Doty's counsel called two expert witnesses to testify, and counsel also read the deposition of another expert witness to the jury. Further, Dr. Doty himself offered expert testimony. Both of Dr. Doty's well-qualified experts testified that the injury Corinne sustained to her nerve during surgery could have occurred in the absence of negligence, and that such nerve injury is a risk that sometimes cannot be avoided with this surgical procedure. One of Dr. Doty's experts testified that during his surgical experience, he had had several patients who sustained comparable nerve injury during similar procedures that were adequately performed. The jury also heard the deposition of another expert surgeon who stated that he has seen similar injuries numerous times in practice without any medical negligence. Finally, Dr. Doty testified that he performed Corinne's surgery in compliance with a reasonable and prudent standard of care. Dr. Doty opined that the nerve likely was damaged as a result of tension brought to bear on the nerve because the ductus was large and because the patient suffered from high blood pressure.