2008 UT App 222

**Crescencio ALCAZAR and Monica Alcazar, Plaintiffs and Appellants,**

v.

**UNIVERSITY OF UTAH HOSPITALS & CLINICS; University of Utah Emergency Department; Jon Middleton, M.D.; and State of Utah, Defendants and Appellees.**

**No. 20070067–CA.**

Court of Appeals of Utah.

June 5, 2008.

Matthew H. Raty, Sandy, for Appellants.

David G. Williams and Bradley R. Blackham, Salt Lake City, for Appellees.

Before THORNE, Associate P.J., BILLINGS and ORME, JJ.

## OPINION

BILLINGS, Judge:

¶ 1 Plaintiffs Crescencio and Monica Alcazar appeal the verdict from their jury trial, arguing that the trial court abused its discretion in refusing to ask their requested voir dire questions concerning the prospective jurors' exposure to information about medical malpractice and tort reform issues. We reverse and remand for a new trial.

## BACKGROUND

¶ 2 Early in the morning on May 4, 2002, Mr. Alcazar went to the University of Utah Emergency Department (the Emergency Department) complaining of intermittent chest pain that had occurred over the prior three days, but stated that his pain was low at the time the Emergency Department physicians examined him. Upon examination, the Emergency Department physicians considered myocardial infarction, or heart attack, as a possible cause of Mr. Alcazar's symptoms but thought it was not likely given Mr. Alcazar's reported symptoms, normal EKG results, and the physicians' physical examination findings. Instead, Mr. Alcazar was diagnosed with atypical chest pain and was monitored until being discharged at 4:00 a.m. in stable condition. Mr. Alcazar was instructed to return to the Emergency Department if his symptoms worsened.

¶ 3 Mr. Alcazar returned to the Emergency Department at 12:40 p.m. that same day, again complaining of continuing intermittent chest pain. However, this time he reported high pain levels, as well as symptoms of nausea, vomiting, and shortness of breath. Given these symptoms and the fact that it was Mr. Alcazar's second visit to the Emergency Department, the attending physician ordered blood testing. The blood testing showed elevated cardiac enzyme levels consistent with acute coronary syndrome. Mr. Alcazar was admitted to the University of Utah Hospital where angiography revealed coronary artery disease, which was successfully treated with the placement of a stent.

¶ 4 On December 23, 2003, Plaintiffs filed a medical malpractice action against Defendants University of Utah Hospitals and Clinics, the Emergency Department, John Middleton, M.D., and the State of Utah (collectively, Defendants). After discovery was completed, the case was set for trial beginning November 13, 2006. At a November 7, 2006 pretrial conference, the trial court re-

viewed and ruled on the parties' proposed jury voir dire questions. At the pretrial conference, Plaintiffs' counsel presented Plaintiffs' First Amended Requested Voir Dire of Potential Jurors, which contained nineteen proposed voir dire questions designed to elicit a potential juror's knowledge of and bias toward medical malpractice cases. These questions included the following:

1. Do you believe a lawsuit is a proper method of resolving disputes concerning compensation for negligent medical care? . . .

2. Have any of you watched, read, or heard anything that suggest a "lawsuit crisis" or the need for "tort reform?" . . .

   a. Do you think the article, program, etc. made some good points?

   b. Did you agree with the points made? . . .

   c. Would you be inclined to reduce the damage award, if any, in this case, because of what you have watched, read, or heard? . . .

3. Have any of you watched, read[,] or heard anything which suggests that jury verdicts are too high or unreasonable? What have you seen, heard[,] or read? . . .

   a. Do you personally believe that jury verdicts are unreasonable?

   b. Do you believe that monetary limits should be placed upon the amounts which a jury can award to an individual who sues for personal injuries? . . . .

5. Have any of you watched, read, or heard anything to indicate that jury verdicts for plaintiffs in personal injury or medical malpractice cases result in higher insurance premiums, [a]ffect the availability of insurance, or result in higher medical costs for consumers? Please explain.

   a. What do you remember about it? Please explain.

   b. Do you think the article, program, etc. made some good points? Please explain.

   c. Do you personally believe that jury verdicts for plaintiffs in personal injury cases result in higher insurance premiums or [a]ffect the availability of insurance? . . .

   . . . .

8. Do any of you have any negative feelings about lawyers who seek compensation for those who have suffered medical malpractice? . . .

   . . . .

11. Have you or any of your close relatives or friends worked or do you or they now work in any aspect of the insurance industry (insurance salesman, employee of an insurance company, adjuster, underwriter, or anything similar)? Please explain. If yes, would that [a]ffect the way you might view this case?

   . . . .

15. Have you or a close friend or relative ever been sued in a medical malpractice lawsuit? Please explain.

(Citations omitted.)

¶ 5 At the pretrial conference, the trial court reviewed Plaintiffs' requested voir dire and ruled that it would not ask questions 1, 2, 3, 5, 8, 11, and 15, and their subparts. Instead, the court stated that it would ask questions similar in substance to some of Plaintiffs' voir dire questions. For example, Plaintiffs requested jury voir dire question 11 on the issue of work experience in the insurance industry. The trial court ruled that it would not ask that particular question but would instead ask potential jurors whether they had any experience working in health care. Plaintiffs also requested jury voir dire question 15 on the issue of whether prospective jurors or their close friends or relatives had ever been sued in a medical malpractice case. The trial court again ruled that it did not need to ask that question because it would cover more than just malpractice cases by asking prospective jurors whether they or a close relative or friend had ever been a party or witness in any kind of lawsuit. When Plaintiffs' counsel repeatedly attempted to persuade the trial court to give the requested voir dire questions, including briefing the rather direct authority from this court on the issue, the court declined and offered its own unique philosophical approach to voir dire in medical malpractice cases.

¶ 6 Before the trial began, voir dire of the thirty-five member panel was conducted by both the trial court and counsel for the parties. Jury voir dire lasted approximately three hours and included private interviews with eighteen members of the venire panel. After the trial court brought a number of panel members in for private interviews, counsel for both parties were given the opportunity to identify any other panel members they wanted to interview privately. In response to the trial court's invitation, Plaintiffs' counsel identified one panel member who was brought in for a private interview. This panel member's wife worked for a pediatrician. Ignoring the trial court's direct instruction not to ask certain questions, Plaintiffs' counsel asked him if his wife had ever expressed negative feelings about medical malpractice cases or if he had any feelings one way or the other about medical malpractice cases.

¶ 7 While the trial court did not ask any of the specific tort reform/medical malpractice questions that Plaintiffs proposed and did not allow Plaintiffs' counsel to do so, it did ask the venire panel the following question: "Has any of you or a close friend or relative personally formed an opinion either in favor or opposed to tort reform or been a member of any organization that has?" In response to this question, one panel member asked, "What's tort reform?" The trial court responded as follows: "I thought we'd get questions. If you don't know what it is, you don't need to worry about it, okay? Thank you."

¶ 8 The jury was empaneled and the four-day trial began on November 13, 2006. The jury returned a unanimous verdict finding that Defendants were not negligent. Plaintiffs now appeal.

## ISSUE AND STANDARD OF REVIEW

■ ¶ 9 On appeal, Plaintiffs argue that the trial court erred in failing to ask their requested voir dire questions. Challenges to the trial court's management of jury voir dire are reviewed under an abuse of discretion standard. *See Barrett v. Peterson*, 868 P.2d 96, 98 (Utah Ct.App.1993).

## ANALYSIS

■ ¶ 10 Voir dire serves two distinct and important purposes: first, "to allow counsel to uncover biases of individual jurors sufficient to support a for-cause challenge" and second, "to gather information enabling counsel to intelligently use peremptory challenges." *Id.* Under Utah law, "a trial judge should liberally allow questions designed to discover attitudes and biases, both conscious and subconscious, even though such questions go beyond that needed for challenges for cause." *Evans v. Doty*, 824 P.2d 460, 462 (Utah Ct.App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992) (internal quotation marks omitted). . This court has held that the questions a trial court asks to uncover such attitudes and biases can include questions "about [a potential juror's] exposure to tort-reform and medical negligence propaganda." *Id.* at 467.

¶ 11 In *Evans v. Doty*, 824 P.2d 460 (Utah Ct.App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992), this court determined that the trial court abused its discretion in failing to ask jurors questions about their exposure to tort reform information. *See id.* at 462. In *Evans*, the plaintiff's counsel requested that the trial court ask jurors both specific questions about a *Time* magazine article entitled, "Sorry, Your Policy Is Cancelled," and general questions about medical negligence and tort reform. *See id.* These questions included:

Have you read magazine or newspaper articles or other literature about medical negligence?

Did any of you read *Time* magazine in March, 1986?

Have you ever signed any petition on the issue of negligence?

Have you seen anything in your doctor's office about negligence?

Have you discussed [medical negligence] with your family doctor or friends?

*Id.* at 462–63 (alteration in original). Instead of asking the plaintiff's proposed questions, the trial court asked the following two questions:

Now, many of you have heard and read articles, and there have been television programs, with regard to negligence on the part of doctors. Do any of you have any strong feelings as a result of seeing or reading anything about medical negligence that would make it so that you couldn't be fair and impartial here today?

Now, do any of you have any strong feelings about anyone bringing a lawsuit against a doctor?

*Id.* at 463.

¶ 12 We concluded that although the trial court did ask whether a potential juror's exposure to medical negligence information would prevent that juror's ability to be fair and impartial, this question was only effective in identifying proper for-cause challenges. *See id.* at 467. The trial court's "questions did not allow the plaintiff an opportunity to know which of the prospective jurors had been *exposed* to tort reform propaganda, totally aside from whether the prospective jurors would themselves admit such exposure had changed their attitudes or biased them." *Barrett,* 868 P.2d at 101 (explaining our holding in *Evans* ); *see also Evans,* 824 P.2d at 467. Essentially, we concluded that "the trial judge's line of questions ignored [the plaintiff's] need to gather information to assist in exercising her peremptory challenges." *Evans,* 824 P.2d at 467.

¶ 13 Our decision in *Evans* was reiterated in *Barrett.* In that case, the trial court again failed to ask potential jurors specific tort reform/medical malpractice questions similar to the questions at issue in *Evans. See Barrett,* 868 P.2d at 97. The plaintiff's counsel attempted to ask during voir dire, "(1) whether [the potential jurors] had 'read magazine or newspaper articles or other literature about medical negligence,' and (2) whether they had 'heard anything on television or radio about the medical negligence issue.' " *Id.* at 102. As we noted in *Barrett,* these questions, as well as several other tort reform questions requested by the plaintiff, were "identical to those submitted by the plaintiff in *Evans.*" *Id.* at 102 n. 7. We concluded that "the trial court should have asked the prospective jurors appropriate pre-

liminary questions ... designed to detect, initially, whether any of the prospective jurors had been exposed to tort reform and medical negligence propaganda." *Id.* Ultimately, we decided that "the trial court's line of questioning ignored [the plaintiff's] need to garner information necessary both to detect actual bias and to intelligently exercise his peremptory challenges." *Id.*

¶ 14 Under *Evans* and *Barrett,* we conclude that Plaintiffs were not given an opportunity to "determine which, if any, prospective jurors had been exposed to tort reform propaganda, much less whether that exposure produced hidden or subconscious biases affecting the jurors' ability to render a fair and impartial verdict." *See id.* The requested voir dire questioning in this case was "no less neutral or general than the preliminary questions required under the voir dire framework outlined in *Evans.*" *See id.* After Plaintiffs' counsel made repeated attempts to introduce the requested voir dire questions, the trial court refused to follow precedent, citing an ideological difference with our prior case law. We acknowledge that the trial court did ask one question: "Has any of you or a close friend or relative personally formed an opinion either in favor or opposed to tort reform or been a member of any organization that has?" However, this question does not rise to the level of questioning necessary under *Evans* and *Barrett,* especially given the panel's response. Specifically, one panel member asked, "What's tort reform?" This does not necessarily indicate that the panel was not exposed to tort reform material, but instead that the panel was unfamiliar with the terminology. The trial court's response did not offer any aid to the panel's understanding or to Plaintiffs' need to uncover the panel's exposure to tort reform/medical malpractice material. The trial court simply stated, "I thought we'd get questions. If you don't know what it is, you don't need to worry about it, okay?" Thus, we conclude that the trial court abused its discretion in refusing to ask Plaintiffs' requested voir dire questions or questions similar in content regarding tort reform/medical

malpractice.[1]

¶ 15 Under *Evans* and *Barrett,* our inquiry does not end once we have established that the trial court abused its discretion in failing to ask any meaningful tort reform or medical malpractice questions during voir dire. *See Barrett v. Peterson,* 868 P.2d 96, 102 (Utah Ct.App.1993). We must next determine if such error is reversible. "[S]ubstantial impairment of the right to informed exercise of peremptory challenges is reversible error." *Id.* (internal quotation marks omitted). We will "reverse if considering the totality of the questioning, counsel [was not] afforded an adequate opportunity to gain the information necessary to evaluate the jurors." *Id.* at 102–03 (alteration in original) (internal quotation marks omitted). We conclude that the trial court's error is reversible.

¶ 16 In *Evans,* we decided that the trial court's error in refusing to ask certain tort reform voir dire questions was harmless. *See Evans v. Doty,* 824 P.2d 460, 467 (Utah Ct. App.1991). During a voir dire that lasted over two hours, the trial court asked questions regarding whether the potential jurors had seen anything or heard anything about medical negligence and whether what they saw or heard would affect their ability to be impartial. *See id.* The trial court also asked whether potential jurors had strong feelings about lawsuits against doctors. *See id.*[2]

¶ 17 Conversely, in *Barrett* we concluded that the trial court's error in failing to ask the plaintiff's requested voir dire questions about tort reform was reversible error because the voir dire was "much less extensive." 868 P.2d at 103. In *Barrett,* "the trial court did not so much as mention the subject of articles and programs on medical negligence, nor did it verbalize the concept of lawsuits against doctors prompting discernible emotions." *Id.* We determined that the trial court's failure to ask the appropriate tort reform questions during voir dire made the plaintiff unable to "identify exposed jurors" and, accordingly, the plaintiff "was denied information helpful in the intelligent use of his peremptory challenges." *Id.* at 104. Thus we concluded that the error in *Barrett* was prejudicial.

¶ 18 In this case, we acknowledge that the overall voir dire was quite extensive, lasting over three hours. The trial court also interviewed many potential jurors independently and gave Plaintiffs' counsel an opportunity to individually interview the potential jurors. However, Plaintiffs' counsel was not allowed to ask any of the questions he had submitted about attitudes toward medical malpractice cases, insurance rates, or tort reform. The only question the trial court asked regarding tort reform is: "Has any of you or a close friend or relative personally formed an opinion either in favor or opposed to tort reform or been a member of any organization that has?" But as we stated earlier, this question is completely inadequate to recognize a potential juror's exposure to tort reform information as evidenced by one panel member's responding question and the fact that the trial court never answered that question. Every other question the trial court asked was directed at uncovering a potential juror's general bias and prejudice, not a potential juror's *exposure* to tort reform or medical malpractice information, or any specific bias they had in the area. The trial court, on the other hand, allowed the potential jurors to be questioned as to both their experience with doctors and hospitals and any negative aspects of this experience. The trial court simply left Plaintiffs' counsel without the necessary information needed to ferret out a potential juror's actual bias or to intelligently exercise peremptory challenges, thus prejudicing Plaintiffs.

## CONCLUSION

¶ 19 Under our prior, clear precedents, we hold that the trial court erred in refusing to

---

1. We note that a trial court could elect to use a questionnaire to efficiently pose such questions to the jury panel, and judicial involvement would only be needed for any suggested follow-up questions. This form of questioning may help eliminate the potential for lengthy voir dire.

2. Furthermore, we note that in *Evans* we adopted a new rule concerning voir dire. It is unsurprising that we determined any error in that case was harmless. However, in this case, the trial court was clearly made aware of the long-standing, controlling law of *Evans* and *Barrett* and was given written voir dire questions to implement their directives.

ask Plaintiffs' requested voir dire questions regarding tort reform and medical malpractice. We further hold that the trial court's error was prejudicial because the trial court's refusal to ask Plaintiffs' counsel's voir dire questions or questions similar in nature substantially impaired his ability to challenge jurors for cause or to exercise his peremptory challenges. Accordingly, we reverse and remand for a new trial.

¶ 20 WE CONCUR: WILLIAM A. THORNE JR., Associate Presiding Judge, and GREGORY K. ORME, Judge.