William E. BARRETT, Plaintiff
and Appellant,

v.

Dennis R. PETERSON, M.D.,
Defendant and Appellee.

No. 910048–CA.

Court of Appeals of Utah.

Dec. 30, 1993.

Jackson Howard, Leslie W. Slaugh, and Linda J. Barclay, Provo, for plaintiff and appellant.

Gary D. Stott, Curtis J. Drake, and Michael Peterson, Salt Lake City, for defendant and appellee.

Before BENCH, GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

Appellant challenges the trial court's denial of his motion for a new trial, in which he claimed the trial court erred by improperly limiting voir dire of the jury panel. We agree, and reverse and remand for a new trial.

## FACTS

Appellant, William Barrett, brought a medical malpractice action against appellee, Dr. Dennis R. Peterson, claiming appellee failed to properly diagnose appellant's acoustic neuroma or take other action that allegedly would have resulted in diagnosis of his condition.

On the first day of the two-week trial, appellant's counsel submitted to the trial court a set of eighty-two voir dire questions accompanied by a supporting memorandum. Of these eighty-two questions, eleven were designed to probe the potential jurors' exposure to tort-reform material.[1] Submitted with the proposed questions were then-current, widely distributed advertisements and articles setting forth insurance industry viewpoints on tort-reform issues.[2] Appellant also requested to personally conduct limited voir dire examination.

During jury selection, the trial judge first asked a number of general voir dire questions, and then asked counsel if there were any questions they wished him to ask the panel. After an off-the-record discussion with appellant's counsel, the trial judge asked the prospective jurors several specific questions not relevant to the issue of tort-reform exposure. Over appellant's objection, the trial judge refused to ask the jurors any of appellant's submitted questions specifically directed at the issue of tort reform.

The jury returned a no-cause-of-action verdict in favor of appellee. Appellant subsequently moved for a new trial arguing, in part, that the trial court improperly limited the jury voir dire examination by refusing to ask potential jurors the tort-reform bias questions he submitted. The trial court denied the motion, and this appeal followed.

Appellant claims on appeal that the trial court failed to ask appropriate preliminary questions of the jury, which would have allowed him to discover which jurors had been exposed to tort-reform material. He argues that his inability to detect such jurors denied him an opportunity to discover whether jurors who had been exposed were biased by such exposure. He claims the court committed reversible error by refusing to allow his counsel to personally conduct voir dire examination and in excluding appellant's proffered voir dire questions.

---

1. "Tort-reform material," and other similar phrases used in this opinion, refers to information about large recoveries in tort cases and the detrimental effect those awards purportedly have on insurance premiums and the availability of insurance.

2. One of these articles, entitled "Sorry, America, Your Insurance Has Been Cancelled," was copied from the widely-read *Time* magazine. Other material included articles published by the Utah Medical Association, which were aimed at the lay public and had been sent to doctors' offices, presumably for distribution in waiting areas.

## STANDARD OF REVIEW

■ We review challenges to the trial court's management of jury voir dire under an abuse of discretion standard. *Evans v. Doty*, 824 P.2d 460, 462 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992); *Doe v. Hafen*, 772 P.2d 456, 457–58 (Utah App. 1989). Generally, the trial court is afforded broad discretion in conducting voir dire, "but that discretion must be exercised in favor of allowing discovery of biases or prejudice in prospective jurors." *State v. Hall*, 797 P.2d 470, 472 (Utah App.), *cert. denied*, 804 P.2d 1232 (Utah 1990). *See also State v. James*, 819 P.2d 781, 797–98 (Utah 1991) (noting importance of voir dire process in eliminating bias and prejudice from trial proceedings). This court will overturn a trial court's discretionary rejection of voir dire questions only upon a showing that "the abuse of discretion rose to the level of reversible error." *Hall*, 797 P.2d at 472. A trial court commits reversible error when, " 'considering the totality of the questioning, counsel [is not] afforded an adequate opportunity to gain the information necessary to evaluate jurors.' " *Evans*, 824 P.2d at 462 (quoting *State v. Bishop*, 753 P.2d 439, 448 (Utah 1988)).

## TORT–REFORM INQUIRY DURING JURY VOIR DIRE

■ Voir dire serves two distinct purposes: 1) to allow counsel to uncover biases of individual jurors sufficient to support a for-cause challenge and 2) to gather information enabling counsel to intelligently use peremptory challenges. *State v. Sherard*, 818 P.2d 554, 558 (Utah App.1991), *cert. denied*, 843 P.2d 516 (Utah 1992); *Doe v. Hafen*, 772 P.2d 456, 457 (Utah App.1989). In light of "the important role that jury voir dire has in ensuring that all litigants in a case receive a fair and impartial jury," *State v. James*, 819 P.2d 781, 797 (Utah 1991), courts must liberally exercise voir dire beyond minimal constitutional requirements in order "to eliminate bias and prejudice from the trial proceedings." *Id.* at 798. In fact, the Utah Supreme Court has emphasized that

> the fairness of a trial may depend on the right of counsel to ask voir dire questions designed to discover attitudes and biases, *both conscious and subconscious, even though they "would not have supported a challenge for cause."* .... Juror attitudes revealed during voir dire may indicate dimly perceived, yet deeply rooted, psychological biases or prejudices that may not rise to the level of a for-cause challenge but nevertheless support a peremptory challenge.

*State v. Worthen*, 765 P.2d 839, 845 (Utah 1988) (emphasis added) (quoting *State v. Ball*, 685 P.2d 1055, 1060 (Utah 1984)).

Such admonitions can be at odds with the traditional reluctance of trial courts to allow questions during voir dire that might suggest defendant possesses insurance coverage for the damages claimed by plaintiff. Thus, courts have been concerned that allowing plaintiffs to question jurors during voir dire about tort-reform issues would infuse the issue of insurance coverage into jury deliberations, thereby prejudicing the defendant's interests. *See Evans v. Doty*, 824 P.2d 460, 463 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992); *Borkoski v. Yost*, 182 Mont. 28, 594 P.2d 688, 692–93 (1979).[3] Yet, more recently, courts have been willing to balance the competing interest of selecting an impartial jury, given the jurors' possible exposure to tort-reform material and the prejudice injected into the proceedings by the questioning itself. Of course, these inquiries into insurance-related issues cannot be used merely to inform the jury that defendant is covered by insurance, but rather must be conducted as good faith efforts to uncover bias. *Evans*, 824 P.2d at 464; *Borkoski*, 594 P.2d at 695.

---

3. *But see Evans*, 824 P.2d 460, at 463–64 n. 3 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992) (discussion of proposition that courts might better control jury speculation about insurance coverage through judicious introduction of the insurance issue during voir dire). *See also Slusher v. Ospital*, 777 P.2d 437, 442–43 (Utah 1989) ("[T]here is considerable authority to the effect that jurors today assume the presence of insurance.") (quoting 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2388, at 282 (1971)); *Broberg v. Hess*, 782 P.2d 198, 200–01 (Utah App.1989) (decision whether to inject insurance issues into voir dire questioning requires balancing of interests of each party).

Plaintiffs may address the issue of insurance via voir dire questioning in three situations: (1) to obtain information regarding prospective jurors' employment, investment, and similar relationships with insurance companies; (2) to determine whether potential jurors have been exposed to *specific*, identifiable media campaigns funded by insurance companies and designed to convince the public of the impact of large damage awards on insurance premiums; and (3) to probe jurors' knowledge of and attitudes toward medical negligence and tort reform in *general. Evans,* 824 P.2d at 463. We need not discuss the first situation because the trial court in this case asked questions that adequately probed the jurors' relationships with insurance companies. To evaluate the permissible limits for inquiries pertaining to the latter two categories, we employ the analytical framework which has been developed in Utah. *See id.* at 464; *Hafen,* 772 P.2d at 458–59. *See also Borkoski,* 594 P.2d at 695.

### A. Inquiries Concerning Specific Tort-reform Campaigns

The case of *Borkoski v. Yost,* 182 Mont. 28, 594 P.2d 688 (1979), set out a procedure for determining when a plaintiff can ask jurors about their exposure to specific tort-reform campaigns and set limits on the extent of such inquiries. In *Borkoski,* a plaintiff in a wrongful death action requested the trial court to permit voir dire of prospective jurors "as to the influence of a national campaign by leading insurance companies with regard to jury awards." *Id.* 594 P.2d at 689. The defendant's insurance company had been an active participant in that campaign. *Id.* The plaintiff presented copies of magazines, such as *Time, Newsweek,* and *Sports Illustrated,* which carried the insurance-sponsored ads. *Id.* at 689–90. At trial, the plaintiff sought permission to determine whether any prospective jurors had been exposed to the national campaigns. *Id.* at 690. The trial court refused his request. *Id.* On appeal, plaintiff claimed that the trial court's refusal to allow his voir dire inquiry prevented him from receiving a fair and impartial jury by denying him an opportunity to ascertain whether the jurors were biased as a result of exposure to tort-reform material. *Id.*

After reviewing the purposes for jury voir dire and the policy behind concealing information from jurors concerning insurance, the court developed a two-tier approach for voir dire inquiries that balances the conflicting interests of selecting an impartial jury and the prejudice infused into the proceedings by the questioning about exposure to tort-reform information. *Id.* at 695. According to the *Borkoski* court, a plaintiff who wishes to determine whether jurors have been biased by specific tort-reform campaigns must make an initial showing of possible prejudice. *Id.* at 694. That is, the plaintiff must demonstrate that potential jurors are likely to have recently been exposed to such material. *See id.* at 694–95. One method for making such a showing is by demonstrating that articles concerning tort reform were recently published in widely-read media. *See id.* After this initial showing, the plaintiff, in order to determine which jurors have been exposed to the material, is entitled to either or both forms of the following preliminary, first-tier questions:

> (1) whether the prospective juror has heard of or read anything (not necessarily related to insurance) which might affect his ability to sit as an impartial juror ...; or (2) whether the prospective juror regularly reads any of the magazines or newspapers in which it has been demonstrated that the insurance advertisements or articles had appeared
>
> . . . .

*Id.* at 695. If any juror answers these inquiries affirmatively, the plaintiff is entitled to proceed to more specific, second-tier questions concerning tort reform. *See id.* Such questions, in an attempt to discover bias within exposed jurors,

> may inquire whether a prospective juror has heard or read anything to indicate that jury verdicts for plaintiffs in personal injury cases result in higher insurance premiums for everyone; if so, whether the prospective juror believes such materials; and if so, whether that belief will interfere with

the juror's ability to render a fair and impartial verdict.

*Id.* at 694. Depending on the response to these inquiries, further questioning can be pursued, subject to the trial court's discretion.[4] *Id.*

In *Evans v. Doty*, 824 P.2d 460 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992), this court directly applied the *Borkoski* analysis to voir dire questioning about specific tort-reform material. *Id.* at 465–66. *Evans* involved a medical malpractice action where plaintiff's counsel requested a number of questions aimed at uncovering exposure to tort-reform material and submitted a 1986 *Time* magazine article "as a specific example of such propaganda." *Id.* at 462. Instead of asking the plaintiff's proposed tort-reform voir dire questions, the trial court in *Evans* asked:

> Now, many of you have heard and read articles, and there have been television programs, with regard to negligence on the part of doctors.[5] Do any of you have any strong feelings as a result of seeing or reading anything about medical negligence that would make it so that you couldn't be fair and impartial here today? Now do any of you have any strong feelings about anyone bringing a lawsuit against a doctor?

*Id.* at 463. After the first question and ensuing answers and discussion, two potential jurors were dismissed for cause, but there were no responses to the second question. Following additional voir dire, the trial court impanelled the jury over plaintiff's objections. *Id.*

Insofar as the plaintiff contended she was entitled to ask specific questions about the *Time* article, the *Evans* court concluded that because the article was three-years old at the time of trial, it was unlikely that any juror would remember reading that particular piece. *Id.* at 466–67. The plaintiff therefore failed to make the initial showing of prejudice required under the *Borkoski* analysis. *Id.* at 467. Accordingly, the trial court did not abuse its discretion by refusing to ask the plaintiff's questions regarding exposure to specific tort-reform material. *Id.*

## B. Inquiries Concerning General Knowledge of Tort Reform

In addition to voir dire questions aimed at uncovering exposure to specific tort-reform campaigns or advertisements, the plaintiff in *Evans* claimed the court erred by refusing to ask questions submitted to uncover exposure to tort-reform information in general. *Evans v. Doty*, 824 P.2d 460, 467 (Utah App. 1991), *cert. denied*, 836 P.2d 1383 (Utah 1992). This proposed inquiry concerned the third category of insurance-related voir dire: prospective jurors' general knowledge and attitudes concerning tort reform and insurance premiums. Although *Borkoski* only involved a situation in which the plaintiff wanted to uncover exposure to specific tort-reform material, the *Evans* court reasoned that the underlying rationale of *Borkoski* nevertheless warrants inquiry into general exposure, even in the absence of specific examples of tort-reform campaigns or advertisements. *Id.* at 465.

The *Evans* court explained that the decision about whether such voir dire questions should be asked "requires a balancing of the relative interests of the parties in light of the facts and circumstances of the particular

4. Ultimately, the *Borkoski* court held that although denial of the requested voir dire inquiries was in error, it was harmless because the particular ad campaign dealt with the *amount* of damages and the jury had found that defendant was not even negligent. Hence, the jury never reached the issue of damages. *See Borkoski*, 594 P.2d at 695.

The dissenting opinion favors adoption of this aspect of *Borkoski*. We reject this approach to harmless error analysis in the present context. The distinction between liability and damages may not be as clear in the mind of jurors as it is to lawyers and judges. Stated another way, a

juror who has become convinced that damage awards are way out of hand might not restrict the manifestation of his or her bias to the issue of damages; such a juror may well perceive that the first line of attack in keeping damages as low as possible is in finding plaintiff has no cause of action.

5. It is noteworthy that the trial court in *Evans* recognized the likelihood that some jurors had been exposed to tort-reform material, but refused to allow plaintiff to discover who those specific jurors might be.

case." *Id.* at 467. Specifically, "in tort cases, and more particularly in medical malpractice cases, we cannot ignore the reality that potential jurors may have developed tort-reform biases as a result of an overall exposure to such propaganda." *Id.* "Reason suggests that exposure to tort-reform propaganda may foster a subconscious bias within certain prospective jurors." *Id.* This is precisely the type of bias that counsel must be allowed to uncover if an impartial jury is to be impaneled. *Id.* at 462. Accordingly, even when specific examples of tort-reform propaganda are not presented to the court, a "plaintiff has a legitimate interest in discovering which jurors may have read or heard information generally on medical negligence or tort reform." *Id.* at 467.

As previously noted, the trial court in *Evans* first asked potential jurors whether, "as a result of seeing or reading anything about medical negligence," they would be unable to act as fair and impartial jurors in a medical malpractice action. *Id.* at 463. This inquiry proved inadequate upon appellate review. *Id.* at 467. The *Evans* court reasoned that although the trial court asked questions "sufficient to ferret out actual tort-reform biases," *id.*, which would be essential for proper use of for-cause challenges, the questions did not allow the plaintiff an opportunity to know which of the potential jurors had been *exposed* to tort-reform propaganda, totally aside from whether the prospective jurors would themselves admit such exposure had changed their attitudes or biased them. *See*

*id.* Thus, concluded the *Evans* court, the trial court should have asked the potential jurors some of the plaintiff's questions concerning their exposure to tort reform material, not just questions concerning whether they, in their personal opinion, had been biased by any such exposure. *Id.*

█ In light of the pervasive dissemination of tort-reform information, and the corresponding potential for general exposure to such information by potential jurors, a plaintiff is entitled to know *which* potential jurors, if any, have been so exposed. *See id.* Plaintiff is entitled to such information absent any particular showing of specific campaigns, advertisements, or literature offered for the purpose of showing potential prejudice. *See id.* Failure to ask such questions ignores the plaintiff's "need to gather information to assist in exercising . . . peremptory challenges." *Id.*

We now proceed to assess appellant's claim with this framework in mind.

## PROPRIETY OF TRIAL COURT'S VOIR DIRE QUESTIONING IN THIS CASE

█ In the instant case, appellant essentially claims the trial court's failure to ask appropriate preliminary questions or to ask any of the supplemental voir dire questions concerning tort reform, coupled with its refusal to allow his counsel to conduct limited voir dire,[6] impaired his ability to intelligently

---

6. Appellant argues that the trial court committed reversible error by refusing to allow counsel either to personally conduct voir dire or to supplement voir dire with his proposed questions. Appellant relies on *Whitlock v. Salmon,* 104 Nev. 24, 752 P.2d 210 (1988), in which the Nevada Supreme Court held that "[a] complete denial of attorney-conducted voir dire cannot be construed as a reasonable restriction and therefore the trial judge committed reversible error." *Id.* 752 P.2d at 213. While this may be the law in Nevada, Utah courts, according to long-standing custom, usually conduct voir dire themselves. *See Ostler v. Albina Transfer Co.,* 781 P.2d 445, 447 (Utah App.1989) (trial judge has considerable discretion in directing manner and form of voir dire examination). Utah Rule of Civil Procedure 47(a) specifically invests trial judges with the discretion to either allow or disallow direct voir dire questioning by counsel. Rule 47(a) provides:

The court *may* permit the parties or their attorneys to conduct the examination of prospective jurors *or* may itself conduct the examination. In the latter event, the court shall permit the parties or their attorneys to supplement the examination by such further inquiry as is material and proper *or shall itself* submit to the prospective jurors such additional questions of the parties or their attorneys as is material and proper.

Utah R.Civ.P. 47(a) (emphasis added). The rule directs that if the trial court itself conducts voir dire, it must allow additional inquiry, either by the court or by the parties, "as is material and proper." *Id.* This language gives the trial court discretion in determining whether questions submitted by counsel are material to the case at hand, and whether such questions are proper for jury voir dire. While the trial court is obliged to conduct voir dire so as to allow counsel to intelligently exercise peremptory challenges, Rule

exercise his peremptory challenges. The trial court in this case asked the prospective jurors general questions regarding whether they would be willing to give a large award if it was supported by evidence, whether they felt it appropriate to resolve disputes in court, whether any of them were involved in the writing of insurance, and whether any of them were in an unfair frame of mind.

Appellant argues these questions were insufficient to elicit information concerning exposure to medical negligence and tort-reform material. Through his proposed voir dire questions, appellant's counsel attempted to ask the prospective jurors, among other things: (1) whether they had "read magazine or newspaper articles or other literature about medical negligence," and (2) whether they had "heard anything on television or radio about the medical negligence issue." These questions, as phrased, are no less neutral or general than the preliminary questions required under the voir dire framework outlined in *Evans*.[7]

The proper lines of inquiry, as explained in that opinion, clearly require a court to ask potential jurors the sort of general tort-reform questions appellant sought to ask, in order to uncover exposure to tort reform material, regardless of whether the plaintiff provides specific examples of tort-reform campaigns. Moreover, appellant in the instant case would have been entitled to ask his requested questions under the *Borkoski* approach alone because he made an initial showing of prejudice by providing specific, widely distributed articles and advertisements that he believed could have biased prospective jurors.

In this case, none of the questions asked by the trial court even remotely addressed whether the prospective jurors had *heard* or *read* anything relating to tort-reform issues. Nor did the trial court attempt to address in a more general fashion the issues of medical negligence and tort-reform propaganda in its voir dire questioning. The court asked only

broad questions concerning the prospective jurors' self-assessed ability to be fair and impartial. As a result of this limited line of questioning, appellant was wholly unable to determine which, if any, prospective jurors had been exposed to tort reform propaganda, much less whether that exposure produced hidden or subconscious biases affecting their ability to render a fair and impartial verdict. Thus, under *Evans*, the trial court's line of questioning ignored appellant's need to garner information necessary both to detect actual bias and to intelligently exercise his peremptory challenges.

Accordingly, we conclude that the trial court should have asked the prospective jurors appropriate preliminary questions—either those suggested by appellant or alternative questions more to its liking—designed to detect, initially, whether any of the prospective jurors had been exposed to tort reform and medical negligence propaganda. Had the trial court done so, and had any of the jurors responded positively to these initial questions, appellant would have been entitled to have more specific questions put to the jurors designed to probe those jurors' attitudes regarding, and possible bias resulting from, the tort-reform information.

### HARMLESS ERROR?

Under *Evans v. Doty*, 824 P.2d 460 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992), our conclusion that the trial court should have allowed additional voir dire questioning does not end our inquiry. *Id.* at 467. "The failure to ask an appropriate question on voir dire does not always constitute an abuse of discretion requiring reversal." *Id.* However, "[s]ubstantial impairment of the right to informed exercise of peremptory challenges is reversible error." *Hornsby v. Corporation of the Presiding Bishop*, 758 P.2d 929, 933 (Utah App.1988). Accordingly, we must reverse if " 'considering the totality of the questioning, counsel [is not] afforded

47(a) does not require that all of counsel's submitted questions be asked, nor that they be asked in the exact form as submitted by counsel, much less does it require that counsel pose the questions. In the end, it is which questions are asked that matters—not who asks them.

7. Several of the tort-reform questions submitted by appellant in this case are identical to those submitted by the plaintiff in *Evans*. *See* 824 P.2d at 463.

an adequate opportunity to gain the information necessary to evaluate the jurors.' " *Id.* at 932 (quoting *State v. Bishop,* 753 P.2d 439, 448 (Utah 1988)).

■ Appellee argues that regardless of whether the trial court asked questions sufficient to determine prospective jurors' exposure to tort-reform information, a trial court's voir dire ruling and subsequent entry of judgment may be reversed only if appellant demonstrates that the absence of error committed below would have resulted in a different outcome at trial. *See Hall v. Blackham,* 18 Utah 2d 164, 417 P.2d 664 (1966); *Onyeabor v. Pro Roofing, Inc.,* 787 P.2d 525, 529 (Utah App.1990). While this concept of prejudicial error may be appropriately applied in cases where the appellant claims, for example, an error in the admission of evidence, such a standard is impossible to apply in the context of voir dire questioning. An appellant claiming that the trial court's unreasonable limitation of voir dire substantially impaired his ability to exercise peremptory challenges simply cannot prove, in the traditional way, that prejudice resulted from the error. Appellant cannot show with any certainty that had certain questions been asked, particular responses would have been received; that certain jurors would then have been challenged for cause or peremptorily; and that particular, more favorably predisposed jurors would have been seated instead, who would have deliberated to a different result. Accordingly, in this context, we apply the test enunciated in *Hornsby:* Prejudicial error is shown if the appellant's right to the informed exercise of peremptory challenges has been "substantially impaired." 758 P.2d at 933.

■ Appellee argues that even assuming the trial court was obligated to ask prospective jurors preliminary questions concerning their exposure to medical negligence and tort-reform propaganda, the court conducted an appropriate inquiry overall. Therefore, appellee claims that any failure to ask preliminary tort-reform questions must be deemed harmless error, the conclusion reached in *Evans. See* 824 P.2d at 468. We disagree. While the trial court in *Evans* failed to ask prospective jurors questions regarding exposure to tort reform information, the court in that case engaged in extensive voir dire overall, during which it commented about articles and television programs in asking them whether anything they had read or heard with regard to medical negligence would affect their ability to be fair and impartial. *See id.* at 467. The court also inquired whether any had strong feelings about lawsuits against doctors. *See id.*

The record in this case, by contrast, reveals that despite appellant's submission of supplemental voir dire questions accompanied by a supporting memorandum, no pertinent questions regarding tort-reform and medical negligence issues were asked, even indirectly, nor were such matters even touched upon by the trial court. In view of our earlier conclusion that appellant was denied an opportunity to ferret out jurors who had been exposed to tort-reform material, and was prevented from further questioning of such jurors, appellant's ability to intelligently exercise his peremptory challenges was substantially impaired. The factors which permitted the *Evans* court, in what must have been a close call, to determine that the voir dire problems there were harmless, are simply not present here. In the instant case, the overall voir dire was much less extensive. Moreover, in contrast to *Evans,* the trial court did not so much as mention the subject of articles and programs on medical negligence, nor did it verbalize the concept of lawsuits against doctors prompting discernible emotions.

Our conclusion that the error in this case was prejudicial to appellant under the *Hornsby* standard, uniquely applicable in the jury voir dire context, is further supported by an examination of the two crucial purposes behind asking preliminary questions aimed at discerning exposure to tort-reform information. First, these questions identify those jurors to whom particularized questions aimed at detecting *actual* bias may be productively directed. Second, regardless of a prospective juror's response to particularized questions about the effect of mere exposure, counsel can include the fact of exposure in the calculus for determining how to best utilize peremptory challenges. Thus, when

proper preliminary questions are asked, counsel is able to direct peremptory challenges at those who have been exposed, even if those jurors claim not to have been influenced by such exposure. Because appellant here was entirely unable to identify exposed jurors, he was never allowed to ask appropriate questions directed toward detecting actual bias, expressed or subconscious, and he was denied information helpful in the intelligent use of his peremptory challenges. Accordingly, the inadequate voir dire in this case substantially impaired appellant's right to the informed exercise of peremptory challenges, and thus constitutes reversible error. *See Hornsby,* 758 P.2d at 933.

As we noted in *Hornsby,* our decision today does not "require the trial court to propound the precise questions proposed by [litigants]." *Id.* Trial courts retain their considerable discretion to contain voir dire within reasonable limits. *See id.* We hold only that in cases such as this one, the plaintiff is entitled during voir dire to elicit information from prospective jurors as to whether they have read or heard information generally on medical negligence or tort reform, and to follow up with appropriate questions if affirmative responses are received.

## CONCLUSION

The trial court's failure to ask prospective jurors threshold questions sufficient to elicit information on the jurors' possible exposure to tort-reform and medical negligence information prevented appellant from detecting possible bias and from intelligently exercising his peremptory challenges. The trial court's limitation of voir dire questioning substantially impaired appellant's right to the informed exercise of his peremptory challenges, and therefore constitutes reversible error. The judgment in favor of appellee is

reversed, and the case is remanded for a new trial.

GREENWOOD, J., concurs.

BENCH, Judge (dissenting):

I respectfully dissent. The main opinion improperly addresses issues that, as a result of the jury's no-cause-of-action verdict, are not before this court. In dicta, however, the main opinion goes far beyond the scope of the case law governing the issues framed in the main opinion. In the event that the main opinion might be misconstrued as binding case law, I feel compelled to respond to the main opinion's analysis.

### No–Cause–Of–Action Verdict

Prior to selecting the jury, plaintiff presented to the trial court several articles concerning tort reform. Plaintiff argued that he should be able to have the prospective jurors questioned as to their awareness of such articles. Plaintiff submitted eleven proposed questions with respect to tort-reform issues. Over plaintiff's objections, the trial court refused to ask any of plaintiff's questions. After a two-week trial, the jury returned a no-cause-of-action verdict.

The main opinion overlooks the import of the jury's verdict with regard to plaintiff's arguments on appeal. Plaintiff has not alleged that the jury returned a no-cause-of-action verdict as a result of the trial court's alleged inadequacies in its voir dire questioning with respect to tort-reform issues. In fact, the article and advertisements submitted by plaintiff discuss tort-reform issues in the context of the amount of damages being awarded by juries after negligence is determined. They simply do not suggest that juries should not make the initial determination of negligence.[1] Therefore, in order to

---

1. The main opinion argues that actual holding in *Borkoski v. Yost,* 182 Mont. 28, 594 P.2d 688, 695 (1979), draws too fine a distinction between the effect tort-reform material might have on the initial finding of negligence as opposed to the effect it might have on the actual amount of the award. *See* main opinion, at 100 n. 4. The main opinion therefore argues that we should only selectively use *Borkoski* by relying on its dicta and ignoring its actual holding. The main opinion states that "a juror who has become con-

vinced that damage awards are way out of hand might not restrict the manifestation of his or her bias to the issue of damages; such a juror may well perceive that the first line of attack in keeping damages as low as possible is in finding plaintiff has no cause of action." *Id.* If properly raised, this issue might conceivably have merit. However, just as in *Borkoski,* plaintiff in the instant case presented to the trial court tort-reform material not on the initial determination

even get to the question, plaintiff must show that he was prejudiced in the initial negligence determination by the trial court's failure to inquire into the prospective jurors' familiarity with the articles. Plaintiff has made no such showing.

This very issue was addressed in *Borkoski v. Yost*, 182 Mont. 28, 594 P.2d 688 (1979), principally relied on by the main opinion. In that case, Borkoski filed a medical malpractice action against several doctors and a hospital. Borkoski argued by motion that he should be permitted to question prospective jurors as to the influence of a national campaign by leading insurance companies with regard to tort-reform issues. The trial court denied Borkoski's motion. Following the presentation of evidence, the jury returned a verdict in favor of defendants. On appeal, the Montana Supreme Court opined at length, but in dicta, about how issues of tort-reform material should be handled during voir dire. However, the court concluded with the following statement:

> Unfortunately, the foregoing conclusions [with respect to tort-reform issues] do not avail Borkoski on this appeal. Even though we accept Borkoski's arguments, it is undeniable that the purpose of advertisements was to reduce the *amount of damages* awarded by a jury. At no point is it suggested, either by Borkoski or in the advertisements themselves, that juries should not find a party negligent in the first place. The ads speak only to damages, not liability. Here, the jury found defendant doctors not liable at all. The jury did not even reach the question of damages. In such a case, Borkoski's arguments lose their vitality, and any error committed must be viewed as harmless and not grounds for reversal.

*Id.* 594 P.2d at 695 (citation omitted). This is precisely the situation in the present case. The jury never even reached the issue of damages. Therefore, like the conclusion in *Borkoski*, any alleged error committed by the trial court during voir dire must "viewed as harmless and not grounds for reversal."

This should be the end of the main opinion's inquiry and any analysis beyond this point is superfluous and mere dicta.

### Specific Tort-reform Information

The main opinion, however, proceeds to analyze the merits of plaintiff's arguments. In its treatment of plaintiff's arguments, it goes far beyond the controlling case law governing voir dire when issues involving specific tort-reform material are present. As indicated by the main opinion, there are three different situations when plaintiffs may attempt to address tort-reform issues during voir dire:

> First, plaintiffs have sought to inquire into prospective jurors' relationships with insurance companies.... Second, plaintiffs have requested permission to determine whether jurors have been exposed to a specific, identifiable media report or advertising campaign; often where insurance companies have funded such a campaign to convince the public of the "evils" of modern tort law and the impact of large jury awards on insurance premiums.... Finally, plaintiffs have sought to inquire of jurors as to their general knowledge about and attitudes toward medical negligence and tort reform without regard to a specific advertising campaign or news media report.

*Evans v. Doty*, 824 P.2d 460, 463 (Utah App. 1991) (citations omitted), *cert. denied*, 836 P.2d 1383 (Utah 1992). The main opinion seems to indicate that this case may fit within either the second or third categories. However, plaintiff presented a specific article and several advertisements to the trial court, and now complains that the trial court erred in not conducting additional voir dire with respect to possible bias as a result of the identified articles. Therefore, this case fits squarely within the second category regarding specific tort-reform articles and campaigns.

Since this case involves specific tort-reform articles, it is governed by *Ostler v. Albina Transfer Co.*, 781 P.2d 445 (Utah App.1989),

---

of negligence, but on the amount of tort awards. Plaintiff does not argue that he was in any way prejudiced by the initial determination of negli-

gence. The main opinion has therefore improperly recast plaintiff's arguments on appeal.

*cert. denied*, 795 P.2d 1138 (Utah 1990), which was the first case in this jurisdiction to deal with specific tort-reform material. *See State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993) (under stare decisis, first appellate panel to issue opinion on particular question of law binds all subsequent panels). This case is therefore governed not by *Evans,* as asserted by the main opinion, but by *Ostler.* In relying on the wrong case, the main opinion applies the wrong test and needlessly confuses the analysis where the voir dire process is challenged with respect to specific tort-reform material.

In *Ostler,* the plaintiff presented to the trial court several questions regarding specific tort-reform material. The trial court refused to ask plaintiff's questions. On appeal, the plaintiff argued that the voir dire was inadequate to reveal bias related to a specific tort-reform advertising campaign conducted by a national insurance agency. This court did not apply the complex analysis contained in the *Borkoski* dicta, but instead applied the traditional test by looking at the voir dire questioning as a whole to determine whether the trial court abused its discretion. 781 P.2d at 447 (citing *Doe v. Hafen,* 772 P.2d 456, 457–58 (Utah App.1989), *cert. denied,* 800 P.2d 1105 (Utah 1990)). The court concluded:

> In lieu of plaintiff's proposed questions, the judge informed the venire that plaintiff's claim may exceed a million dollars and asked if any would object to an award of that magnitude. None did. The judge also asked if any of the prospective jurors believed that people should not resort to the courts to settle disputes or recover damages for injuries. Again, none did.

The judge followed with a question asking whether any believed they were incapable of rendering a fair and true verdict based on the evidence. None responded affirmatively. In their totality, and in the context with the remainder of voir dire, these questions are substantially responsive to plaintiff's concerns and appear sufficient to reveal "tort reform" bias in the manner discussed in *Doe,* 772 P.2d at 458–59. Plaintiff, therefore, has not shown an abuse of discretion in the court's voir dire of prospective jurors.

781 P.2d at 447.

Applying the *Ostler* test to present case, it is clear that the trial court did not abuse its discretion in its voir dire questioning. The trial court asked the prospective jurors whether any of them owned stock in any companies. None indicated that they owned stock in any insurance companies. The court then informed the prospective jurors that plaintiff's claim for damages could exceed several hundred thousand dollars and asked whether any of them could not give such an award if it was supported by the evidence.[2] None of the prospective jurors indicated they could not give such an award. The court asked if any of the prospective jurors believed that it was not appropriate to go to court to resolve disputes and determine compensation for damages.[3] None did. The court asked the prospective jurors whether they would be satisfied to have their own case tried with jurors possessing their present state of mind. None indicated they would not be satisfied. The court also asked the prospective jurors if there was any reason that any one them felt they should not serve on the jury. None indicated they

---

**2.** This question is clearly sufficient to address any concerns with regard to a bias resulting from tort-reform information limiting the amount of damages awarded after negligence is determined. If no prospective juror indicates bias, it is hard to imagine any intelligible reason for going further and inserting the specter of tort-reform material into the voir dire. By so doing, the plaintiff may in fact create the very bias that he or she was hoping to avoid. If on the other hand, a prospective juror, in response to this question, indicated they could not give a large award it is conceivable that it might be necessary to probe further. However, without such a response there is no conceivable reason to require

the trial court to discuss tort-reform material where no question of bias has been shown.

**3.** This question goes to the broader issue of whether a prospective juror would be able to make the initial finding of negligence. If the prospective juror felt that it was not appropriate to go to court to resolve disputes, it is likely that that juror would be less willing to make the initial finding of negligence. Since none of the prospective jurors indicated a bias, there was no reason to probe further especially by injecting the issue of tort-reform material with the possibility of prejudice to the plaintiff.

should not serve. The court further asked whether any of the prospective jurors, members of their families, close friends, or associates were involved in writing long-term disability or health and accident insurance. One prospective juror responded that her husband was involved in writing insurance. She was removed with a peremptory challenge. One other prospective juror responded that her brother-in-law was in the insurance industry, but indicated that she was not familiar with any policies or underwriting procedures. She eventually served on the jury. No other prospective panelists responded affirmatively.

In their totality, and in the context of the remainder of the court's voir dire questioning, the specific questions asked by the court are substantially responsive to plaintiff's concerns and appear sufficient to reveal "tort-reform" bias in the manner discussed in *Ostler*, 781 P.2d at 447. Plaintiff has not shown that the trial court abused its discretion in refusing to use his specific questions during voir dire. While the main opinion likewise concludes that the trial court did not abuse its discretion in this context, it utilized an erroneous test and relied on improper case law in reaching its conclusion.

### General Tort-reform Information

The main opinion also analyzes this case as if it involved general exposure to tort-reform material. The main opinion mistakenly relies upon *Evans* since an alleged general exposure to tort-reform material was first dealt with in this jurisdiction by *Doe v. Hafen*, 772 P.2d 456, 458–59 (Utah App.1989), *cert. denied*, 800 P.2d 1105 (Utah 1990).

In *Hafen*, the plaintiff, dissatisfied with the amount of judgment received, claimed on appeal that the trial court erred in not asking specific questions with respect to whether any prospective jurors had formed opinions about high damage awards because of tort-reform information. The trial court did ask, however, whether any of the prospective jurors had read or experienced anything that would affect the amount of compensation they were willing to award. This court adopted the reasoning in *Borkoski's* dicta in order to analyze whether the trial court's questioning had been adequate. *Id.* at 458. This court focused on the *Borkoski* requirement that before any specific questioning would be allowed, the court must ask a broad preliminary question with regard to whether any of the prospective jurors would be unable, for whatever reason, to be a fair and impartial juror. If any of the prospective jurors indicated they could not be fair and impartial, more specific questioning might be warranted. Applying this principle to the case before it, this court held that in light of the broad general question asked by the court "we conclude the judge properly refused to continue questioning the prospective jurors about [tort-reform information]." *Id.*

Applying the *Hafen* test to the present case, the trial court asked several broad preliminary questions designed to determine whether any of the prospective jurors would not be able to be fair and impartial. None of the prospective jurors indicated that they could not serve fairly and impartially. Under *Hafen*, the questioning was then at an end, and the trial court had no obligation to probe further.[4] Therefore, the trial court did not abuse its discretion by refusing "to continue questioning the prospective jurors about [tort-reform information]." *Id.*

By ignoring *Hafen*, the main opinion has done away with the requirement that there be some initial showing of a question of bias before a plaintiff is entitled to ask specific questions regarding tort-reform material.[5] The main opinion states,

> indicating that it is looking for bias related to tort-reform material.

4. The main opinion indicates that the preliminary broad general question must be phrased so as to detect "whether any of the prospective jurors had been exposed to tort reform and medical negligence propaganda." However, under *Hafen*, there is simply no requirement that the trial court focus specifically on "tort reform and medical negligence propaganda." The trial court, under *Hafen*, retains the discretion to merely ask a broad preliminary question without

5. The *Evans* court similarly ignored the holding in *Hafen* by suggesting that a tort plaintiff is always entitled to have the prospective jurors questioned about general tort-reform bias. 824 P.2d at 467.

In light of the pervasive dissemination of tort-reform information, and the corresponding potential for general exposure to such information by potential jurors, a plaintiff is entitled to know *which* potential jurors, if any, have been so exposed. Plaintiff is entitled to such information absent any particular showing of specific campaigns, advertisements, or literature offered for the purpose of showing potential prejudice.

As a result of the main opinion's ruling, plaintiffs will now demand that the trial court ask specific questions regarding tort-reform material without any initial showing of a bias. I believe that is contrary to case law and general principles governing voir dire.

### Conclusion.

I would affirm the no-cause-of-action verdict. The issue of tort-reform bias influencing the amount of the award is not before us because the jury never reached the issue of damages. In any event, the trial court did not abuse its discretion in conducting voir dire with respect to tort-reform issues.