**2018 UT App 96**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRIAN K. WILLIAMS,
Appellant.

Opinion
No. 20160625-CA
Filed May 24, 2018

First District Court, Logan Department
The Honorable Kevin K. Allen
No. 141100362

Elizabeth Hunt, Attorney for Appellant

Sean D. Reyes and Aaron G. Murphy, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES KATE A. TOOMEY and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1    Although he testified that the events underlying this case never happened, a jury convicted Defendant Brian K. Williams of sexually abusing his three daughters. After Defendant was convicted, the district court sentenced him to multiple prison terms, several of which are potentially for the remainder of his life. Because we conclude that irregularities occurred in the State's juror examination,[1] we reverse his convictions and remand for a new trial.

---

1. Juror examination is often referred to as "voir dire." Because both terms describe the same "tool for counsel and the court to

(continued…)

BACKGROUND

¶2    Defendant's three daughters, Oldest, Middle, and Youngest, accused Defendant of sexually abusing them repeatedly over a five-year period. During this time, the alleged abuse included, but was not limited to, touching his daughters' breasts and pubic areas; showering with them; and on one occasion, forcing his daughters to undress and smear body paint on each other as Defendant watched.

¶3    The State charged Defendant with six counts of aggravated sexual abuse of a child and six counts of forcible sexual abuse. During juror examination, the trial court asked potential jurors about their personal and professional lives before allowing counsel for the State and Defendant to conduct additional juror examination.[2]

¶4    During trial, the jury heard testimony from Defendant's daughters, who detailed the abuse.[3] The jury also heard

---

(…continued)

carefully and skillfully determine, by inquiry, whether biases and prejudices, latent as well as acknowledged, will interfere with a fair trial if a particular juror serves in it," *see State v. Ball*, 685 P.2d 1055, 1058 (Utah 1984), we use the terms interchangeably.

2. The specific content of the State's juror examination is set forth in more detail below. *Infra* ¶¶ 15–23.

3. As we explain, *infra* ¶¶ 5–8, some of the daughters' trial testimony conflicted with their testimony at the preliminary hearing. Other pieces of information were contradicted at trial. "In reviewing a jury verdict, we view the evidence . . . in a light most favorable to the verdict." *State v. Maestas*, 2012 UT 46, ¶ 36, 299 P.3d 892 (cleaned up). However, we also present conflicting

(continued…)

testimony regarding the daughters' difficulties in school, their depression, Oldest's habit of cutting herself, and Oldest and Middle's joint overdose on antidepressants and subsequent hospitalizations. The State's expert testified that these behaviors were consistent with symptoms exhibited by sexual abuse victims.

¶5    Oldest's trial testimony conflicted with her testimony at Defendant's preliminary hearing in some respects. She initially testified that Defendant showered with her once or twice a month before the family moved, but at trial she said it happened only once, total, in the family's first house. At the preliminary hearing, she testified that she could not recall Defendant touching her in the shower, but at trial she said he "cupped" her breasts and buttocks and washed her body. Oldest testified at the preliminary hearing that Defendant touched her breasts and vaginal area five to ten times at the first house; but at trial she could not recall him touching any of her body parts at the first house. Shortly after her assertion at trial that Defendant had not touched her in the first house, she testified regarding an incident in the first house during which Defendant had touched her inappropriately while wrestling.

¶6    Middle originally testified at length at the preliminary hearing about Defendant's abuse of her sisters, but later admitted at trial that she had never seen him inappropriately touching Oldest or Youngest. When Middle initially reported Defendant's abuse, she denied that he had ever inserted his finger into her vagina. But at trial, she testified that he did so on multiple occasions, explaining that she originally denied this behavior because she wanted to minimize the trouble Defendant would be in.

---

(…continued)

evidence where it is necessary to understand the issues raised on appeal. *See State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346.

¶7     Youngest's testimony that Defendant left "white gooey stuff" on her legs after a back rub was a detail reported for the first time at trial. Youngest explained that she only recalled that fact as she was testifying. At trial, on cross-examination, Youngest frequently answered that she could not recall the information she was asked to provide.

¶8     All three daughters' stories regarding the body-painting incident differed from one another. Oldest testified that she and Middle had been painting a picture when the sisters started painting each other. Defendant then instructed them to remove their clothing, and he stripped down to his underwear, before they all painted one another. When she was asked about this incident at the preliminary hearing, she denied that it occurred; only at trial did she allege that it took place. Middle testified that Defendant had told them he ordered the paints online. When he produced them, they all removed their clothes and started painting each other. Youngest also testified that Defendant bought the paints online and explained that he made them remove their clothing. Middle and Youngest testified that after they painted each other, all four showered together. Oldest made no such claim.

¶9     Defendant testified in his own defense and denied sexually abusing any of his daughters. The jury convicted Defendant as charged. He now appeals.


ISSUES AND STANDARDS OF REVIEW

¶10    Defendant argues that we should reverse his convictions for any one of five reasons. First, he asserts that the jury instructions given at trial were inadequate. Second, he asserts that during the State's closing argument, the prosecutor engaged in misconduct by (1) impermissibly bringing to the jury's attention facts not in evidence, (2) arguing that Defendant lied, (3) disparaging the integrity of defense counsel, and (4) appealing to the jury's fears by seeking a verdict to protect

society. Third, he asserts that the State violated rule 608 of the Utah Rules of Evidence by improperly bolstering the credibility of its witnesses. Fourth, he asserts that the State offered inadmissible evidence of his invocation of his right to counsel. And fifth, he asserts that during his testimony, he was improperly asked to opine on the veracity of other witnesses.

¶11 Defendant did not raise any of these arguments before the trial court. Instead, he brings his claims under the doctrines of ineffective assistance of counsel and plain error. To demonstrate ineffective assistance of counsel, Defendant must:

> (i) identify specific acts or omissions by counsel that fall below the standard of reasonable professional assistance when considered at the time of the act or omission and under all the attendant circumstances, and (ii) demonstrate that counsel's error prejudiced the defendant, i.e., that but for the error, there is a reasonable probability that the verdict would have been more favorable to the defendant.

*State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993). To demonstrate plain error, Defendant

> must show the following: (i) An error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined.

*Id.* at 1208–09.


ANALYSIS

¶12 Although Defendant raises many potential grounds for reversing his convictions, we are persuaded by his arguments

regarding the irregularities and impropriety that occurred during juror examination.[4] Because we reverse on that ground and remand for a new trial, we need not consider the other issues raised. *See State v. Holm*, 2017 UT App 148, ¶ 8 n.2, 402 P.3d 193.

¶13 While the issue of determining when a juror examination has crossed the line into impermissible indoctrination is one of first impression, the true purpose of juror examination is well settled in our jurisprudence: to "determine, by inquiry, whether biases and prejudices, latent as well as acknowledged, will interfere with a fair trial if a particular juror serves in it." *Salt Lake City v. Tuero*, 745 P.2d 1281, 1283 (Utah Ct. App. 1987) (cleaned up). But the privacy interests of prospective jurors "must be balanced against the historic values . . . and the need for openness of the process." *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 512 (1984).

> To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record.

---

4. Defendant argues that the State used the voir dire process to improperly bolster the credibility of his daughters' testimony. Utah jurisprudence has long held that witnesses may not be bolstered by improper means. *See State v. Adams*, 955 P.2d 781, 786 (Utah Ct. App. 1998).

*Id.*[5] In determining whether the trial court properly balanced the privacy interests of the jurors with Defendant's constitutional right to present the case before an impartial jury, we review the court's decision for plain error.[6]

---

5. Other jurisdictions have held similarly. *See People v. Knight*, 2013 IL App (4th) 111127-U, ¶ 45 (holding that at a minimum, the court's responsibility includes "not permitting (1) courtroom proceedings to embarrass them and (2) trial court participants to engage in offensive conduct"); *State v. Roby*, 2017 ME 207, ¶ 12, 171 A.3d 1157 ("In order to select a qualified and impartial jury, the trial court has considerable discretion over the conduct and scope of juror voir dire, because it is the trial court that has the responsibility of balancing the competing considerations of fairness to the defendant, judicial economy, and avoidance of embarrassment to potential jurors." (cleaned up)); *People v. Mulroy*, 439 N.Y.S.2d 61, 65 (N.Y. Sup. Ct. 1979) ("[In conducting voir dire] . . . this court conceives that it has the highest obligation, first, to the prospective juror that, if sworn, he may serve with a free mind, unfettered by personal discomfiture, embarrassment or subconscious restraint and, second, to all who stand before the bar of justice, to assure that such juror will be ultimately able to make his determination fairly and impartially, without fear, favor or sympathy.").

6. We would reach the same result if we instead reviewed Defendant's claim that his trial counsel was ineffective for failing to object to the juror examination process. This is because the same error that should have been plain to the trial court should have alerted trial counsel to act. There was no strategic reason not to object, and in choosing not to, trial counsel's performance fell below an objective standard of reasonableness. Likewise, where we conclude that Defendant was harmed by the trial court's failure to intervene, we would conclude that trial counsel's performance prejudiced Defendant. *Cf. State v. Bruun*, 2017 UT App 182, ¶ 79, 405 P.3d 905 (explaining that "the

(continued…)

¶14 Defendant argues that "the prosecution began its campaign to bolster the alleged victims at the outset of the jury selection." After reviewing the transcript of juror examination, we agree. We conclude that an error occurred and that the error should have been obvious to the trial court. Because Defendant's challenge is best understood by experiencing the flow of the State's juror examination in its odd entirety, we quote at length from it. Any emphasis is our own.

¶15 The prosecutor began by sharing, "My experience has been that jurors want to do a good job. They want to do a good job. They just want to make sure they understand all the evidence, and they want to do a good job." She then assured the prospective jurors, "So as I talk to you right now, just understand there are not right or wrong answers. I'm just trying to find out how you view life, how you view your job as a juror, things of that nature, *and maybe what your thoughts are on child sex abuse . . . .* So please feel free to raise your hand."

¶16 After encouraging members of the venire to "just be honest," she initiated a discussion about child sex abuse:

> [Prosecutor]: How do you know children are sometimes sexually abused?
>
> . . . .
>
> [Prospective Juror]: Well, I can think of three friends that have either had someone in their family sexually abused or themselves.
>
> [Prosecutor]: Were these close friends?
>
> [Prospective Juror]: Well, they're friends. I—

---

(…continued)
prejudice standard under ineffective assistance of counsel and plain error is the same").

[Prosecutor]: Friends, okay. That you're aware—

[Prospective Juror]: They're not my closest friends.

[Prosecutor]: Yeah, but you—*they shared with you the fact that they've had children in their family abused and so on and so forth*. So how is it that society sort of proves or becomes aware of child sex abuse?

Prospective jurors provided answers, such as, "Well, the person that has done that to the child has said that they did," and "Or it is medically proven."

¶17 Apparently not hearing the answer she wanted, the prosecutor continued, "So let's say someone decides to be really brave and say, 'Okay, okay, okay, I've been touching a kid.' That may happen. *I've never seen it*, but—I'm only kidding. But how else?" An inaudible response was given, and then the prosecutor stated, without getting an answer from any member of the jury pool, "So a child may be acting weird or they may say something, and then an adult gets wind of that and then they report that. Is that generally what happens? In the end, what is it that causes it? *Isn't it* that the child says . . . something is bothering me."[7]

¶18 Next, the prosecutor asked, "So you as jurors in a case like this, *are you going to* require anything more in terms of physical evidence or other corroboration necessarily?" After receiving an inaudible response, she began talking about "CSI or Law and Order or Boston Legal" regarding "physical evidence" and asserted, "I'm just going to tell you that I think you know this, but it's actually an important concept to realize that we are not

---

7. The official transcript ends this sentence with a period, rather than a question mark. Given the declaratory tone of most of this portion of the juror examination, we do not think that is a mistake.

required to do CSI investigations or work. We just have to prove beyond a reasonable doubt." She asked, "*Would any of you require that type of evidence in order to convict someone of this type of crime?*" When she saw "some brow furrowing" she followed up with one of the prospective jurors:

> [Prosecutor]: What are you thinking up there, Ms. [K.]?
>
> [Ms. K.]: I'm thinking maybe so.
>
> [Prosecutor]: Okay, maybe so. Okay, tell me about that. That's fine.
>
> [Ms. K.]: I mean I don't know that it would need to be D—I don't know. I'm not sure what evidence[.]

Eventually the prosecutor elicited from Ms. K. that she would likely expect to see more evidence than solely "a child's report in and of itself."

¶19 With this understanding, the prosecutor switched course and began discussing "general rule[s]" about child sexual abuse. She asked, "[I]s a child abused in secret or somewhere where it is not secret?" Without pausing for an answer, she stated,

> *So that's kind of a no brainer, right*? *Everybody* understand[s] . . . who is usually there? The perpetrator and the child, right? Okay.
>
> So who are the only two people in the world who really know what really happened? *Just those two*. If a child is touched, and it isn't reported immediately, is that something that we're necessarily going to have physical evidence of? Does that mean it didn't happen? *No. Okay.*

¶20 Next came a conversation about delayed reporting and why that might occur. Some prospective jurors provided

answers—fear, guilt, and grooming.[8] When the answer "grooming" was given, the prosecutor replied, "Grooming, okay. Okay. Very good. Very good."

¶21 Changing tack, the prosecutor engaged in the following exchange:

> [Prosecutor]: Now I sometimes do this, and it's really awful, but . . . I sometimes say—who do I want to pick on? I wonder if you would turn to Ms. [M.] there and—is it [M.]?
>
> [Ms. M.]: Uh-huh.
>
> [Prosecutor]: Okay. If you would just *tell her about the very last sexual experience you had*, and if you could be very detailed, okay? Please make sure you don't (inaudible) the body parts and where everybody put everything and all of that. Would you mind just turning and just sharing that with her?

Meaning to use this as a demonstration of how the court system often asks victims in child sexual abuse cases to testify as to "some pretty embarrassing things," she ended the inquiry without actually requiring the venire to engage in such an

---

8. The definition of grooming ranges from "testing the waters" and "breaking down boundaries so as to not get caught," *see Benedict v. State*, No. 05-15-00958-CR, 2016 WL 3742127, at *3 (Tex. App. July 7, 2016), to "less intrusive and less highly sexualized forms of sexual touching, done for the purpose of desensitizing the victim to future sexual contact," *see People v. Steele*, 769 N.W.2d 256, 269–70 (Mich. Ct. App. 2009). Given varying definitions of what grooming might mean, it can certainly be considered a loaded term and it is unclear from the record what the prospective juror was referring to.

intimate conversation. She said, "I'm not going to ask you do that. Why do I ask that? Why do I ask that?" And when someone gave the answer she was looking for, she replied, "There we go. There we go."

¶22    The discussion shifted to the topic of changed stories and why someone might give different accounts of the same story. The prosecutor frequently replied to prospective jurors' answers by saying things like, "Yeah, exactly," or, "That's exactly right." Then she discussed with the venire whether we can "tell who touches children by looking at them." Receiving no answers from individual members of the jury pool, the prosecutor presented a string of questions, the answers to which were implied:

> Can we tell by how much money they make? Can we tell by how old they are? Can we tell by how they look?
>
> What about their personality? What about if they're very charming? Does that tell us? *Do charming people touch children*? Do you think?[9]

¶23    Finally, the prosecutor ended with what we consider standard juror examination questions regarding prospective jurors' willingness to "sit in judgment of another person," whether they would feel "uneasy about having to hear about sexual abuse," whether anyone "just doesn't want to be here," and whether there was "anything that [they could] think of that makes [them] feel like" they should not sit on the jury.

---

9. This portion of the juror examination is important in light of the State's closing argument, when the prosecutor mirrored these words: "[Defendant] is very charming. He's likeable." This passage particularly informs our consideration of whether the juror examination process prejudiced Defendant. *See infra* ¶ 38–40.

¶24　Defendant now argues that the prosecutor's juror examination was "more of a Socratic lecture on why the jurors should believe the [victims], despite and even because of the inconsistencies in their claims." He complains that "rather than asking questions designed to skillfully cull [honest] attitudes from the jurors, the prosecutor asked the panel of prospective jurors a number of rhetorical questions designed to indoctrinate the jurors on the State's theor[ies]" of the case.

¶25　The State responds that the juror examination simply involved "friendly responses to juror answers," and suggests that because "none of these questions or comments related to any particular witness or testimony," juror examination was "merely designed to ferret out biases among the jurors that might predispose them to disbelieve children." For several reasons, we cannot agree that the prosecutor's juror examination was as innocuous as the State asserts.

¶26　First, the prosecutor posed "hypothetical questions closely approximating the facts of the case . . . and delivered a lecture." *See State v. Martin*, 877 N.W.2d 859, 860 (Iowa 2016) (reviewing this and more concerning behavior in a prosecutor's juror examination but refusing to grant a new trial "[i]n part because [the defendant] did not object in the district court to all the statements he challenge[d] on appeal"). Such questions, and the relevant fact scenarios, included:

- "If a child is touched, and it isn't reported immediately, is that something that we're necessarily going to have physical evidence of? Does that mean it didn't happen? No. Okay." Defendant's daughters delayed reporting, and there was no physical evidence of their abuse.

- "Do charming people touch children?" The prosecutor later described Defendant as "charming."

- "So let's say someone decides to be really brave and say, 'Okay, okay, okay, I've been touching a kid.' That may happen. I've never seen it, but—I'm only kidding." Defendant never wavered on his position that he had never touched his daughters inappropriately, and by presenting denial as an inference of guilt during juror examination, the prosecutor improperly indoctrinated the jury to react favorably to the same argument at trial.

¶27 Additionally, the prosecutor devoted much of her juror examination to making statements and posing rhetorical questions rather than inquiring into the prospective jurors' thoughts and attitudes, including:

- Making proclamations about the general pattern of sexual abuse, such as, "[I]s a child abused in secret or somewhere where it is not secret? So that's kind of a no brainer, right?"

- Telling the venire its options for whom to believe at trial. "So who are the only two people in the world who really know what really happened? Just those two."

- Indicating when prospective jurors gave answers she liked and praising them, showing (despite her opening remarks to the contrary) that there were indeed right and wrong answers. "Okay. Very good. Very good." "There we go. There we go." "Yeah, exactly." "That's exactly right."

¶28 Finally, in many instances, the prosecutor posed questions without awaiting a response. "Isn't it that the child says . . . something is bothering me." "Everybody understand[s] . . . who is usually there? The perpetrator and the child, right? Okay." On this point, we consider persuasive a

Virginia case discussing juror examination questions posed by a trial judge.

> Proof of a prospective juror's impartiality should come from him and not be based on his mere assent to persuasive suggestions. When asked by the court, a suggestive question produces an even more unreliable response. A juror's desire to say the right thing or to please the authoritative figure of the judge, if encouraged, creates doubt about the candor of the juror's responses.

*Bradbury v. Commonwealth*, 578 S.E.2d 93, 95 (Va. Ct. App. 2003) (cleaned up). And like the judge's questions in *Bradbury*, the prosecutor's questions in the present case

> were leading, long, and complex. They suggested the answer that the [prosecutor] preferred to hear, compressed several issues into one phrase, and generally incorporated several legal concepts. These questions constituted persuasive suggestions more than an impartial inquiry and, as such, were an ineffective means [of conducting voir dire].

*See id.* at 96 (citation omitted).[10] While jurors ordinarily might place more weight on a judge's comments than those of the

---

10. This is to say nothing of the concept of "commitment" or "stake out" questions. *See Haarhuis v. Cheek*, 805 S.E.2d 720, 725 (N.C. Ct. App. 2017) ("A stake out question asks a juror to pledge himself or herself to a future course of action by asking what verdict the prospective juror would render, or how they would be inclined to vote, under a given state of facts." (cleaned up)); *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001) ("Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact."). Some states have

(continued…)

State, the State's representative commands similar respect, and with that respect the same inherent danger exists that, when improperly prompted, a juror will attempt to say the "right" thing or otherwise please the prosecutor with certain responses. This danger is heightened in a group setting where jurors may be inclined to make socially acceptable responses.

¶29 The process employed by the prosecutor in this case was not designed to find out what jurors' thoughts or attitudes were, but instead served as an attempt to influence the jury panel—in effect intentionally tainting it with a bias favorable to the State's case. And while the prosecutor never couched her questions or comments by reference to a specific victim, it is clear, given the context, that the prosecutor was essentially arguing the State's case and inappropriately bolstering the anticipated testimony of the alleged victims.

¶30 This is not the purpose of juror examination. *See supra* ¶ 13. A party is not permitted to argue a case under the auspices of jury selection. A majority of the cases we discovered that have ruled on this issue do not allow questions or statements that serve to "pre-educate and indoctrinate jurors as to the [party's] theory of the case." *People v. Boston*, 893 N.E.2d 677, 681 (Ill. App. Ct. 2008); *see also, e.g., People v. Landry*, 385 P.3d 327, 354 (Cal.

---

(…continued)

prohibited these sorts of questions during juror examination altogether. *See, e.g., Stewart v. State*, 923 A.2d 44, 54 (Md. 2007); *State v. Parks*, 378 S.E.2d 785, 787 (N.C. 1989); *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 756 (Tex. 2006); *Standefer*, 59 S.W.3d at 183. And while we have encountered no Utah case addressing these sorts of questions, we note that the prosecutor's juror examination included questions that may offend the standards of those other states. *See supra* ¶ 18 ("[A]re you going to require anything more in terms of physical evidence or other corroboration necessarily?"; "Would any of you require that type of evidence in order to convict someone of this type of crime?").

2016) (holding that it is not the purpose of juror examination to educate, compel, prejudice, indoctrinate, or instruct the jury); *Preston v. State*, 306 A.2d 712, 715 (Del. 1973) ("Too often we see the [v]oir dire process being misused to argue the case, to indoctrinate the jury, and to seek other undue advantage."); *People v. Bell*, 505 N.E.2d 365, 373 (Ill. App. Ct. 1987) (reversing where a juror examination "went beyond a probe for bias and sought to educate the jury and convert the panel to [the prosecutor's] beliefs" and other grounds); *Coy v. State*, 720 N.E.2d 370, 372 (Ind. 1999) (holding a party's "attempt to indoctrinate the jury during [juror examination] may require reversal if his or her questions amount to misconduct"); *State v. Iromuanya*, 806 N.W.2d 404, 425 (Neb. 2011) (holding that "parties may not use [juror examination] to impanel a jury with a predetermined disposition or to indoctrinate jurors to react favorably to a party's position"); *Khoury v. Seastrand*, 377 P.3d 81, 86 (Nev. 2016) (noting that "while counsel may inquire to determine prejudice, he cannot indoctrinate or persuade the jurors" (cleaned up)); *State v. Broyhill*, 803 S.E.2d 832, 841 (N.C. Ct. App. 2017) (holding that counsel may not attempt to cause jurors to "pledge themselves to a particular position in advance of the actual presentation of the evidence"(cleaned up)); *State v. Frederiksen*, 700 P.2d 369, 374 (Wash. Ct. App. 1985) (noting that juror examination questions must be reasonably calculated to "discover an actual and likely source of prejudice" (cleaned up)).

¶31　Furthermore, a majority of the cases that we have discovered relevant to this issue have held that questions or statements about specific defenses, scenarios, or evidence—even presented as hypotheticals—should be excluded from juror examination.[11] *See, e.g.*, *Boston*, 893 N.E.2d at 681; *see also Steelman v. State*, 602 N.E.2d 152, 158 (Ind. Ct. App. 1992) (holding that

---

11. While there are exceptions for "matters of intense controversy," those exceptions do not apply in the present case against Defendant. *See People v. Boston*, 893 N.E.2d 677, 681 (Ill. App. Ct. 2008).

juror examination "should not be used to begin trying the case before evidence has been presented"); *State v. Holmes*, 5 So. 3d 42, 56 (La. 2008) (holding that "Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical scenario which would demand a commitment or pre-judgment from the juror"); *Iromuanya*, 806 N.W.2d at 425 (holding that "counsel may not use [juror examination] to preview prospective jurors' opinions of the evidence that will be presented"); *State v. Johnson*, 706 S.E.2d 790, 793 (N.C. Ct. App. 2011) (noting that "a defendant is not entitled to put on a mini-trial of his evidence during [juror examination] by using hypothetical questions [or] situations to determine whether a juror would cast a vote for his theory"); *Broyhill*, 803 S.E.2d at 841 (holding that "stakeout" questions were improper where counsel posed "hypothetical evidence or scenarios to attempt to 'stake-out' prospective jurors" (cleaned up)); *State v. Janis*, 2016 SD 43, ¶ 23, 880 N.W.2d 76 (holding that "questions regarding what the jurors considered to be signs of intoxication" were impermissible). Simply stated, these types of "stakeout" questions are improper.

¶32 The issue of determining when a juror examination has crossed the line into impermissible indoctrination is one of first impression. While Utah case law does address situations in which the juror examination is too *restrictive*, we have not found any Utah case discussing when juror examination is too *permissive*. *See State v. Saunders*, 1999 UT 59, ¶¶ 38, 43, 992 P.2d 951 (reversing and remanding where defense counsel was prohibited from investigating possible bias regarding "specialized knowledge concerning child sexual abuse" during juror examination); *State v. Holm*, 2017 UT App 148, ¶ 18, 402 P.3d 193 (reversing and remanding where the trial court did not permit questions regarding "jurors' experiences and the experiences of persons close to them in serious car collisions"); *Alcazar v. University of Utah Hosps. & Clinics*, 2008 UT App 222, ¶ 1, 188 P.3d 490 (reversing and remanding where the trial court refused to allow questions regarding jurors' attitudes toward tort reform and medical malpractice).

¶33    Nevertheless, as pointed out above, the proper purpose of juror examination is well established in Utah law. The prosecutor's approach departed from this well-established purpose and the prosecutor's departure should have been obvious to the judge. Looking to other jurisdictions supports the conclusion that error occurred here. *People v. Knight*, 2013 IL App (4th) 111127-U, is instructive in this case. There, the court reviewed a defendant's convictions for sexual assault and aggravated sexual abuse. *Id.* ¶ 2. During juror examination, the prosecutor asked prospective jurors, "Would somebody volunteer to tell all of us about your last sexual experience?" *Id.* ¶ 6. Presumably because no one volunteered, the prosecutor followed up with, "How about last year, experience from last year? Doesn't have to be the most recent." *Id.* Again, the prosecutor had no takers. So he asked a specific prospective juror, "Why didn't you raise your hand and tell everybody about that[?]" *Id.* This led to a discussion about "feelings of nervousness and embarrassment and that sort of thing involved and attached to that question," as well as how difficult it would be for a fifteen-year-old girl to share details about sexual abuse by her stepfather. *Id.*

¶34    The Illinois Appellate Court reviewed for plain error the defendant's claim that "the prosecutor improperly indoctrinated the jurors during [juror examination]." *Id.* ¶ 33. Noting that "[t]he threshold question, o[f] course, is whether any error occurred at all," the court concluded, "Here, an error occurred." *Id.* ¶¶ 35–36. It explained:

> [Juror examination] is not to be used as a means of indoctrinating a jury, or impaneling a jury with a particular predisposition. In this case, the prosecutor erroneously incorporated specific facts from his case into his [juror examination] inquiry, essentially attempting to bolster his star witness's credibility before the trial began[.]

*Id.* ¶ 36 (cleaned up). Ultimately, though, the Illinois court concluded that the defendant had not been prejudiced by this error and affirmed his convictions. *Id.* ¶¶ 37, 50.[12]

¶35 The similarity between portions of the State's juror examination in the present case and that at issue in *Knight* allows us to easily and similarly conclude, "Here, an error occurred." *See id.* ¶ 36. Both cases involved a father figure allegedly sexually abusing his daughters. Both prosecutors asked inappropriately intimate questions about the jurors' sex lives. Both prosecutors used their examination questions to segue to a discussion regarding the difficulties of sharing intimate details in a public setting. And in doing so, both prosecutors improperly attempted to bolster the victim's credibility. We accordingly conclude, like the Illinois Appellate Court, that the "prosecutor should never have asked these questions, and once they were asked, the trial court should have emphatically stopped this line of inquiry." *See id.* ¶ 44. Because the trial court presiding over Defendant's case did not intervene, it erred.

¶36 We note that in the present case, the improper juror examination went far beyond the error identified in *Knight*. Additional problematic questions posed by the prosecutor in this case make it a clear call. Here, the prosecutor impermissibly used juror examination to preview and argue her case, explaining how child sex abuse cases are reported, investigated, and proven at trial and coaching the potential jury members on how they should evaluate the evidence. In *People v. Boston*, 893 N.E.2d 677 (Ill. App. Ct. 2008), the Appellate Court of Illinois

---

12. However, a member of the panel dissented, arguing "the error rises to the level of plain error." *People v. Knight*, 2013 IL App (4th) 111127-U, ¶ 53 (Turner, J., dissenting). Because the case "hinged on credibility," and the prosecutor's improper juror examination was "designed to bias the jurors in assessing credibility," the dissent concluded that the error was prejudicial. *Id.* ¶ 54.

reversed and remanded the trial court's decision to allow counsel to ask similar questions, such as

> is there anyone that believes if a person or a woman gets an order of protection against someone and then invites that person over that she has the [order of protection] against, does anyone believe that the invitation itself equals consent to a later sexual act? . . . [I]s there anyone that believes a person consents to a sexual act if they [do not] scream or fight or kick or yell or scratch or hit? Anyone require a victim to do any of those things while [she is] being assaulted?

*Id.* at 681. The court held that these questions impermissibly "highlighted factual details about the case and asked prospective jurors to prejudge those facts." *Id.*

¶37    Again, we conclude that a similar error occurred in this case, which should have been obvious to the trial court.[13] When the prosecutor veered from acceptable juror examination territory, the trial court allowed it. Furthermore, the trial court allowed the prosecutor to improperly bolster the anticipated testimony of the daughters and invited the jury to prejudge the case. This process was disconnected with the true purpose of juror examination, which is to "determine, by inquiry, whether biases and prejudices, latent as well as acknowledged, will interfere with a fair trial if a particular juror serves in it." *Salt*

---

13. Illinois's plain-error doctrine requires "a clear or obvious error," *id.* ¶ 34 (majority opinion), similar to our requirement that an appellant arguing plain error demonstrate that "the error should have been obvious to the trial court," *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993). Thus, while the *Knight* court did not explicitly decide that the error was clear or obvious, its conclusion that there was an error implies that clear or obvious error occurred.

*Lake City v. Tuero*, 745 P.2d 1281, 1283 (Utah Ct. App. 1987). Using juror examination as a tool to indoctrinate the jury on a party's argument or bolster anticipated witness testimony is improper.[14]

¶38    As stated, the multiplicity of the prosecutor's divergence from the established purpose of juror examination was error and should have been obvious to the trial court. We are thus tasked with considering whether "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993). We conclude that had error not occurred, there is a reasonable likelihood that Defendant would have had a more favorable outcome. Our reasoning is two-fold.

¶39    First, the prosecutor's attempts to bolster the victims' credibility were not isolated incidents, but permeated the State's entire juror examination. When she did ask questions, they were almost always premised on facts—presented as hypotheticals— that mirrored the actual facts of this case. *See supra* ¶¶ 27–28. Instead of asking open-ended questions, her questions resembled those one would expect to hear on cross-examination. *See supra* ¶¶ 27–28. In short, where the juror examination process was replete with suggestive questions and improper allusions to the actual facts of this case, and lacking in questions meant to root out biases, Defendant's trial was tainted before it began.

---

14. In Utah's trial courts, the days of perfunctory—and often insufficient—judge-only-conducted juror examination are gone. Indeed, our rules now expressly provide for attorney-conducted juror examination, *see* Utah R. Crim. P. 18(b), and many judges and attorneys wisely embrace the conscientious use of a well-drafted questionnaire. But a free-for-all attorney-conducted juror examination in the presence of the entire venire carries with it a substantial risk of irreparably tainting the entire panel and effectively guaranteeing the resulting mistrial.

¶40 Second, the case turned on the credibility of the victims, and the improper juror examination predisposed the jury to believe the victims' testimony, despite evidence of inconsistency. We acknowledge that the State presented a large amount of evidence indicating Defendant's guilt. But that evidence was not without its problems, and ultimately the case turned entirely on the victims' testimony. The incongruities in the daughters' testimony, *see supra* ¶¶ 5–8, thus compound the concerns that began during juror examination and undermine our confidence in Defendant's convictions. *See Dunn*, 850 P.2d at 1209. We therefore reverse.

CONCLUSION

¶41 We reverse Defendant's convictions. Given the trial court's failure to intervene in the State's improper juror examination, the court plainly erred. Coupled with the inconsistencies in the evidence, our confidence in the jury's verdicts is undermined. We therefore remand for a new trial.

_____