**2025 UT App 108**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
COLTON JASE HOVINGHOFF,
Appellant.

Opinion
No. 20240147-CA
Filed July 10, 2025

Third District Court, Salt Lake Department
The Honorable Kara Pettit
No. 221902773

Nathalie S. Skibine, Attorney for Appellant

Derek E. Brown and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1      Colton Jase Hovinghoff was convicted by a jury of a single count of object rape. In this appeal, Hovinghoff maintains his attorney (Counsel) was ineffective in two ways, which he argues should entitle him to a new trial. First, he claims Counsel should have objected to several questions posed during the voir dire process. Second, he claims Counsel should have objected on hearsay and other grounds to the admission of text messages between the victim and her friend. We reject Hovinghoff's claims of ineffective assistance—on the first claim because we perceive no deficient performance and on the second claim for lack of prejudice—and affirm his conviction.

BACKGROUND[1]

*The Sexual Assault*

¶2    On a Friday night in July 2021, Audrey,[2] Hovinghoff, and Hovinghoff's spouse (Wife) drove to Salt Lake City from Orem to "check out a bunch of bars." Wife and Audrey attended the same beauty school in Provo. The trio booked a single hotel room with two beds to save money. Audrey had two or three drinks throughout the evening—"not a lot" because she had to work the next day. Wife drank about "five-ish shots and a couple of girlie drinks," after which she felt very drunk. Hovinghoff did not drink as much as either of them.

¶3    At around one in the morning, the three made their way to the hotel room. Wife immediately went into the bathroom and vomited. Wife then "got in the bath," hoping it might make her feel better. Audrey said that she was going to go down to the lobby to get some crackers for Wife, thinking it might help with her nausea. On hearing this, Hovinghoff "jolted up" and seemed "pretty eager to go with her." Hovinghoff and Audrey left, with Hovinghoff promising Wife that he'd be right back.

¶4    The journey took longer than expected. Audrey and Hovinghoff ended up being gone one to two hours. They spent some of the time looking for a nearby fast-food restaurant, but they couldn't find it. They then took a break and sat on a curb, during which time Hovinghoff tried to kiss Audrey by grabbing her head. Audrey pulled away and told Hovinghoff "that wasn't

---

1. "On appeal from a jury verdict, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Garcia-Cardiel*, 2024 UT App 174, n.1, 561 P.3d 692 (cleaned up), *cert. denied*, 564 P.3d 959 (Utah 2025).

2. A pseudonym.

happening." While Audrey agreed to Hovinghoff's request that she not tell Wife about the attempted kiss, she planned to tell her about it in the morning anyway. The pair then purchased some snacks at the hotel lobby and made their way back to the room.

¶5     Wife was still in the bathtub when they returned. Audrey and Hovinghoff went to their respective beds to sleep. While Audrey believed Wife eventually joined Hovinghoff in bed, it appears that Wife actually spent the entire night in the bathtub.

¶6     A few hours after going to bed, as the sun was rising, Audrey awoke to feeling "a weird sensation around [her] groin, around [her] vagina." She described the event: "I look down a little and my button is undone, my zipper is undone, and I see like a bulge right there, and it's [Hovinghoff's] hand and there's a sheet over my head. I don't sleep with sheets on my head. And it was him, his hand inside my pants." Hovinghoff had two to three fingers in her vagina, "trying to go in and out." Audrey pushed Hovinghoff's hand away, and she heard him "shuffling back into his bed."

¶7     Audrey stayed in bed for about an hour, then she got up and told Hovinghoff and Wife she needed to get to work. She didn't know how to confront Hovinghoff or tell Wife about the assault because she was "still trying to comprehend what just happened." Instead, she "just wanted to get home and be safe and cry." Audrey recalled that Hovinghoff "kept being really exaggerative" about how he remembered nothing of the night before, which didn't make sense to Audrey as she knew he had not had much to drink. The three drove back to Orem. After dropping Audrey off at her home, Wife and Hovinghoff went to their home.

¶8     Once Hovinghoff and Wife left, Audrey talked on the phone with a classmate (Classmate) from beauty school. Audrey told Classmate "everything that happened," "screaming and crying" as she did so. After that, Audrey took a nap, during which

she "chewed" on her tongue to such an extent that it was injured, making it difficult for her to talk.

¶9     That same day, Wife texted Audrey because she suspected something had happened between Audrey and Hovinghoff when the two were gone so long from the hotel room. Her suspicion had initially been heightened because Hovinghoff had "seemed so eager to go with" Audrey. Wife specifically asked if Hovinghoff had tried "to make a move" on Audrey. Audrey responded that Hovinghoff had tried to kiss her but she "pushed him off." Then Audrey added, "As well as in the hotel." Wife asked Audrey, "What? Can you please tell me about it, like everything? Don't be scared to say anything. I need to know." Audrey responded, "Honestly, I woke up with my pants undone and I didn't do that shit myself." She later added, "He had his hand down my pants and I pushed him off of me. I was scared to say something, but I was going to tell you when I felt better on Monday."

¶10     On Monday, Audrey went to beauty school, where she told her instructor "everything" that happened. The instructor responded by making sure Audrey and Wife were separated and not allowing Hovinghoff into the school. Audrey also informed the school's director of operations.

¶11     About twelve days after the incident, Audrey reported the assault to the police. She did not talk to the police sooner because she was "traumatized" by the event, was suffering from "literal, actual pain" in her tongue from having chewed it, and "just needed some time." Because too much time had passed since the assault, the police did not have Audrey undergo a forensic exam.

*The Legal Proceedings*

¶12     The State charged Hovinghoff with one count of object rape. One day after charges were filed in March 2022, Audrey claimed that she received a phone call from Hovinghoff. After Hovinghoff told Audrey that he was "really sorry about everything," she immediately hung up. Audrey then texted a

friend (Friend) about the call.[3] In this text exchange, Audrey indicated that her "rapist" had just called her. While Friend responded with sympathy, he also expressed anger at Hovinghoff's audacity for having contacted her.

¶13 In preparation for the trial, the State submitted proposed voir dire questions for potential jury members, one of which was about whether they would be less likely to believe an individual who delayed disclosing and reporting an incident of sexual abuse. While these questions were formally submitted by the State, Counsel indicated that he and the prosecutor had worked together on the questions based on their interactions in a previous unrelated case. The district court revised the question about delayed reporting of sexual assault in an attempt to bring it into conformity with Utah caselaw. Counsel and the prosecutor agreed to this change.[4]

¶14 At trial, the State presented testimony from Audrey, Wife, Classmate, and several police officers, which related the information as summarized above. During Audrey's testimony, the exhibits of the text exchange from March 2022 were offered. Counsel said that he had "[n]o objection" to those exhibits. Hovinghoff did not testify.

¶15 The jury convicted Hovinghoff as charged.

ISSUES AND STANDARD OF REVIEW

¶16 Hovinghoff appeals. He first argues that Counsel was ineffective for not objecting to questions posed to potential jurors

---

3. The full content of this text exchange and its admission as evidence will be discussed below in the Analysis section. *See infra* Part I.

4. The nature of this question and the revision will be addressed in greater detail in the Analysis section. *See infra* Part II.

during voir dire. Hovinghoff also asserts that Counsel was ineffective for not raising hearsay and unfair prejudice objections to text messages between Audrey and Friend. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Ringstad*, 2018 UT App 66, ¶ 32, 424 P.3d 1052 (cleaned up).[5]

## ANALYSIS

¶17   To prove ineffective assistance of counsel, a defendant must establish both prongs of the well-known test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a defendant must show that counsel's performance was deficient by demonstrating "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This means that a "defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (cleaned up). Second, a defendant must show that counsel's "deficient performance prejudiced the defense." *Id.* at 687. This means the defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Torres-Orellana*, 2021 UT App 74, ¶ 29, 493 P.3d 711 (cleaned up), *aff'd*, 2024 UT 46, 562 P.3d 706. In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (cleaned up). "We are free to reject a defendant's claim under either prong of the *Strickland* test because failure to establish either prong is fatal to

---

5. Hovinghoff also argues that the cumulative effect arising from the two alleged instances of the claimed deficient performance was prejudicial. Because we determine that Counsel did not perform deficiently on the first claim, Hovinghoff's cumulative-error claim fails. *See State v. Macleod*, 2024 UT App 32, ¶ 74, 546 P.3d 366 (stating that when "there are no errors to accumulate," a claim of cumulative error "necessarily fails"), *cert. denied*, 558 P.3d 87 (Utah 2024).

an ineffective assistance of counsel claim." *State v. Centeno*, 2023 UT 22, ¶ 64, 537 P.3d 232 (cleaned up).

## I. The Voir Dire Questioning

¶18 Hovinghoff first argues that Counsel performed deficiently in not objecting to questions asking jurors during voir dire "to commit to a position on the reliability of a late report before hearing the evidence in the case." Specifically, Hovinghoff points to the following questions asked by the district court as problematic:

- "The law does not require a crime that is sexual in nature to be reported within any specific period of time. Is there anyone who would refuse to follow that principle of law? If so, please raise your hand."

- "Does the potential fact of the delay cause you any concern at this point? If so, please raise your hand."

- "Would any of you be less likely to believe a witness who did not immediately disclose that sexual abuse had occurred? If so, please raise your hand."

No hands were raised in response to any of these questions.

¶19 Hovinghoff argues that these questions "suggested a response and required jurors to identify themselves in public if they did not agree with the suggested response." Hovinghoff points specifically to the first question as implying that a potential juror might not follow the law and that "late reports" of sexual assault are "expected and appropriate." He argues that the two follow-up questions served to reinforce the notion that "feeling less convinced by a delayed report was refusing to follow the law in the same way that requiring a crime to be reported within some timeframe would be." Hovinghoff further asserts that the group setting encouraged potential jurors to refrain from making socially unacceptable responses to avoid being identified before the judge, the attorneys, and the other potential jurors as disagreeing with the law.

¶20 Hovinghoff claims that the questions ultimately "indoctrinated the jury against" the defense's argument that, while Audrey was able to report the incident immediately to her acquaintances and instructor, she did not make a report to law enforcement for twelve days, ostensibly because "her mouth hurt too much" from having chewed her tongue so that it was difficult for her to talk. That delayed reporting, Counsel had argued, prevented a timely sexual assault medical examination and the collection of DNA evidence. "Jurors who had agreed that they would not require a report of sexual abuse within a certain period of time or find a late report less believable would feel they had committed to resist these arguments." All this, Hovinghoff argues, served to taint the jury with a bias favorable to the State's case by improperly attempting to bolster Audrey's testimony and inviting the jury to prejudge the case.

¶21 We agree that this type of questioning should be avoided in general. We made this point abundantly clear in *State v. Williams*, 2018 UT App 96, 427 P.3d 434. In that case, we observed that the prosecutor asked voir dire questions by posing "hypothetical questions closely approximating the facts of the case and delivered a lecture." *Id.* ¶ 26 (cleaned up). We noted that "the prosecutor devoted much of her juror examination to making statements and posing rhetorical questions," often "without awaiting a response," "rather than inquiring into the prospective jurors' thoughts and attitudes." *Id.* ¶¶ 27–28. We concluded that, in violation of the purpose of juror examination, "the prosecutor was essentially arguing the State's case and inappropriately bolstering the anticipated testimony of the alleged victims." *Id.* ¶ 29.

¶22 The questioning analyzed in *Williams* was beyond the pale, extensively exceeding the questioning that happened here, both in scope and length. In fact, we spent nine paragraphs describing the voir dire questioning conducted by the prosecutor "in its odd entirety" in *Williams* to convey the egregiously inappropriate—bordering on the bizarre—methods the prosecutor employed. *Id.* ¶¶ 14–23. In contrast, the challenged questioning that happened

here was confined to three discrete questions that were developed with a clearly discernible strategic purpose in mind. [6] We reach this conclusion based on two circumstances.

---

6. To be clear, although we ultimately affirm, all three of these questions are troubling and likely at odds with the direction given in *State v. Williams*, 2018 UT App 96, 427 P.3d 434. While questions aimed at ensuring that potential jurors are committed to following the law are appropriate, these three questions are not limited to that principle. The questions seek to ascertain how a juror would digest issues of timing in the disclosure of a sexual assault. We are fully cognizant that delayed reporting of sexual assault is common and is likely not indicative of an issue of credibility. *See, e.g.*, *State v. Jok*, 2019 UT App 138, ¶ 24, 449 P.3d 610 ("[T]he reality [is] that rape victims display a diverse range of reactions to the harm they suffered."), *aff'd*, 2021 UT 35, 493 P.3d 665; *Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) (rejecting "the assumption that the timing of a victim's disclosure of sexual assault is a bellwether of truth" (cleaned up)); *People v. Brown*, 883 P.2d 949, 956 (Cal. 1994) (en banc) ("The overwhelming body of current empirical studies, data, and other information establishes that it is *not* inherently 'natural' for the victim to confide in someone or to disclose, immediately following commission of the offense, that he or she was sexually assaulted."); *State v. Sullivan*, 712 A.2d 919, 922 n.5 (Conn. 1998) ("[T]he assumption that it is 'natural' for victims to report that they have been sexually assaulted has been largely discredited by modern research indicating that victims may not tell others about a sexual assault owing to feelings of shame or fear of public embarrassment."); *People v. Bowen*, 609 N.E.2d 346, 357 (Ill. App. Ct. 1993) ("A delay in reporting incidents of sexual assault may be reasonable where the victim's silence is attributed to fear, shame, guilt and embarrassment."); *Commonwealth v. King*, 834 N.E.2d 1175, 1194 (Mass. 2005) ("[R]esearch suggests that, in part because the harm suffered by sexual assault victims often consists of the psychological harm caused by the defendants' violation of a

(continued…)

¶23  First, the record is clear that Counsel had given some thought to these questions and apparently wanted them asked. Counsel told the district court that he and the prosecutor had "worked . . . together" in an earlier and unrelated case to develop the questions through "kind of a process" to "polish the voir dire on sex related cases."[7] The existence of a collaborative "process" designed to "polish" the questions used in sex-offense cases inescapably establishes that they were the result of thoughtful and intentional deliberation. *See State v. Rivera*, 2022 UT App 44, ¶ 37, 509 P.3d 257 ("A defense attorney's informed strategic choice is virtually unchallengeable." (cleaned up)). Indeed, even after the district court expressed concern that the wording preceding the

---

victim's body, such victims respond in a variety of ways to the trauma of the crime, and often do not promptly report or disclose the crime for a range of reasons, including shame, fear, or concern they will not be believed." (footnote omitted)). But the idea that the law does not allow a juror to consider the timing or circumstances of a report of sexual assault in making a credibility determination is without legal support. These questions, somewhat like those in *Williams*, seemed aimed at asking a juror to prejudge facts, not disclose bias. As we stated in *Williams*, such questions are not appropriate and should be avoided. *Williams*, 2018 UT App 96, ¶¶ 36–40.

7. Hovinghoff appears to argue on appeal that the collaboration was limited to one specific voir dire question related to circumstantial evidence. This assertion is unpersuasive because the record indicates otherwise. The district court said, "I just saw the State's proposed voir dire," which was a list of eleven questions, two of which—including the question at issue here—consisted of multi-part questions. And Counsel responded, "So, Judge, we worked on *those* together." (Emphasis added.) The State then began to discuss the specific question (not at issue here) on circumstantial evidence. But doing so in no way indicates that was the only question on which the two worked together. Thus, it appears that the collaboration between Counsel and the prosecutor extended to the entire list.

questions was potentially "problematic" under the precedent set in *Williams,*[8] Counsel did not express that he shared the same concern. Instead, he seems to have continued to believe that the questions should be asked, subject to the omission of the initial language as suggested by the court.[9]

¶24 Second, there is a readily apparent strategic reason Counsel advocated that these three questions be asked. Our supreme court has said this of voir dire questioning in the context of an ineffective assistance of counsel claim:

> Voir dire is intended to provide a tool for counsel to carefully and skillfully determine, by inquiry, whether biases and prejudices, latent as well as acknowledged, will interfere with a fair trial if a particular juror serves in it. While the jury selection process is of great importance, there are many ways to effectively question jurors, and there are a

---

8. To be clear, the district court did not specifically identify *Williams*. But it's evident that the court was referring to *Williams* from the context of the comments.

9. The question originally read as follows:

> We anticipate that the alleged victim will testify and will tell us that she did not immediately report the sexual abuse. The law does not require a crime that is sexual in nature to be reported within any specific period of time. Is there anyone who would refuse to follow that principle of law? Does the potential fact of the delay cause you any concern at this point? Would any of you be less likely to believe a witness who did not immediately disclose that sexual abuse had occurred?

The court deleted the first sentence and asked this compound question as three distinct questions during voir dire. *See supra* ¶ 18.

> multitude of inherently subjective factors typically constituting the sum and substance of an attorney's judgments about prospective jurors. Given that jury selection is more art than science, trial counsel should be given considerable latitude in asking voir dire questions, especially in view of the fact that only counsel will, at the beginning, have a clear overview of the entire case and the type of evidence to be adduced.

*State v. Houston*, 2015 UT 40, ¶ 92, 353 P.3d 55 (cleaned up). And courts of other jurisdictions have echoed this same concept about the subjective qualities inherent in the jury selection process. For example, the Michigan Court of Appeals observed,

> Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions. However, as a reviewing court, we cannot see the jurors or listen to their answers to voir dire questions.

*People v. Unger*, 749 N.W.2d 272, 304 (Mich. Ct. App. 2008) (cleaned up). A Connecticut court expressed a similar view:

> [A] mere review of the transcript does not reflect the tone and demeanor of the potential juror or the body language or other nonverbal characteristics witnessed by those in the court room. A trial counsel's judgment is not solely based upon the actual words of the venire person, but includes how the words are expressed.

*Tatum v. Warden*, No. CV 911263, 1999 WL 130324, at *11 (Conn. Super. Ct. Mar. 3, 1999), *aff'd sub nom.*, *Tatum v. Commissioner*, 783 A.2d 1151 (Conn. App. Ct. 2001); *see also People v. Tuilaepa*, 842 P.2d 1142, 1152 (Cal. 1992) (en banc) ("Nothing in the record indicates

that counsel lacked a plausible, tactical reason for asking [prospective jurors] few or no follow-up questions. Indeed, counsel might have determined from the demeanor of these prospective jurors that additional questioning would be futile." (citation omitted)), *aff'd sub nom. Tuilaepa v. California*, 512 U.S. 967 (1994); *People v. Lucas*, 907 P.2d 373, 418 (Cal. 1995) ("[C]ounsel's observation of the juror's demeanor . . . may have persuaded them that the defense should accept her as a juror.").

¶25   With this jurisprudence in mind, it is clear that Counsel potentially had much to gain from the three challenged questions that were asked during voir dire. As the State points out, "[a]ny verbal or non-verbal indication [that a potential juror believes delayed reporting renders a sex-crime allegation less credible] would be valuable information in picking a defense-favorable jury." Indeed, Counsel may have very much wanted to observe how potential jurors reacted to the subject of delayed reporting. Perhaps he wanted to look for signs in body language that would indicate some degree of skepticism.

¶26   Moreover, Counsel knew that Audrey had reported the assault to acquaintances shortly after it happened. And a report to law enforcement within twelve days is objectively not that long. Given these circumstances, the case was not really one of delayed disclosure—which would lead Counsel to conclude that the negative impact of the questions would be insignificant compared to their value in allowing him to assess potential jurors' reactions to the questions.

¶27   In sum, given Counsel's active participation in the development of the challenged voir dire questions, and given the potential benefit of the questions to reveal the attitude of the jurors through non-verbal cues, there was obviously strategic value in their presentation during voir dire. Therefore, Hovinghoff's claim of ineffective assistance in this matter fails under the deficient performance prong.

## II. The Text Messages

¶28   Hovinghoff's second claim of ineffective assistance centers on a text message exchange between Audrey and Friend that was admitted as evidence at trial. Audrey testified that in March 2022, on the day after Hovinghoff was charged with object rape, she received a call from Hovinghoff. Audrey didn't speak, but the man told her, "I'm really sorry about everything." After recognizing his voice and realizing it was Hovinghoff, Audrey immediately hung up and texted Friend about the call, resulting in the following exchange:

> *Audrey*: My rapist just called me
>    I never answer my phone why did i answer the
>    phone
>
> *Friend*: Why?
>
> *Audrey*: Im shaking
>    He apologized i hung [up] immediately
>
> *Friend*: At this point you can file an order of protection
>    It'll show up on his record
>
> *Audrey*: I didnt even let him get into once i realized the
>    name he said i went blank and just immediately
>    hung up once i heard im sorry
>
> *Friend*: I'm angry for you
>    I'm sorry pal
>
> *Audrey*: How can he just think its okay to call me on a
>    random Wednesday 9 months later
>
> *Friend*: Someone who doesn't know boundaries

¶29   On appeal, Hovinghoff asserts that Counsel rendered ineffective assistance for not objecting to the admission of this text exchange on the grounds that (1) Friend's statements were hearsay and (2) Audrey's use of "[m]y rapist" and Friend's expression of outrage and sympathy and saying the caller was

"[s]omeone who doesn't know boundaries" was inadmissible under rule 403 of the Utah Rules of Evidence.

¶30     In an ineffective assistance claim, "we do not need to review the deficient performance element before examining the prejudice element, and if it is easier to dispose of [the] claim on the ground of lack of sufficient prejudice, that course should be followed." *State v. Tapusoa*, 2020 UT App 92, ¶ 17, 467 P.3d 912 (cleaned up). Assuming, without deciding, that Counsel performed deficiently in not objecting to or seeking to exclude the text messages, we limit our analysis to the prejudice prong.

¶31     Even if Counsel had been successful in excluding the text messages through objection, there is not a reasonable likelihood that the jury would have acquitted Hovinghoff because the evidence against him was already strong and the challenged text messages did little to change the evidentiary picture. Audrey had already testified that Hovinghoff had digitally penetrated her vagina. She further described the disclosures of the assault she made to Classmate, Wife, and her instructor in the following days. Wife's testimony largely confirmed that Hovinghoff was present at the hotel during the sexual assault. Wife also testified that Hovinghoff was acting suspiciously about wanting to be alone with Audrey and about how he couldn't remember anything after they had gone bar hopping. Moreover, Classmate confirmed that Audrey was emotionally distraught during their phone conversation when she encouraged Audrey to report the incident. All this uncontradicted testimony pointed to one conclusion.

¶32     With the background of this larger evidentiary landscape, the content of the text messages would not have come as any surprise to the jury. Even Audrey's reference to Hovinghoff as "[m]y rapist" would not have surprised the jury. After all, the jury heard Audrey's testimony, in which she described in detail Hovinghoff's actions in the hotel room. Given this, it was not shocking—and certainly not prejudicial—for the jury to hear that Audrey regarded Hovinghoff as a rapist. Even less prone to being prejudicial is an expression of sympathy and anger upon hearing

that a friend was undergoing emotional trauma after being sexually assaulted. The most prejudicial component of the text-message evidence concerns the prelude to it, namely, Audrey saying that she received a phone call from Hovinghoff in which he allegedly told her that he was "really sorry about everything." This statement comes very close to sounding like Hovinghoff was apologizing for the sexual assault on the day after he had been charged with object rape. But Hovinghoff makes no challenge to Audrey's testimony about receiving the phone call or her account of what Hovinghoff allegedly said.

¶33    Having considered Audrey's testimony and the extent to which it was corroborated, we conclude that even if Counsel had successfully objected and the text-message exchange was excluded, there is no likelihood of a more favorable result for Hovinghoff.

## CONCLUSION

¶34    Hovinghoff's first claim of ineffective assistance fails because Counsel did not perform deficiently in not objecting to the challenged voir dire questioning. And Hovinghoff has not shown prejudice for the second ineffective assistance claim.

¶35    Affirmed.

_____